UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------------------------x
Roy Den Hollander,

                Plaintiff on behalf of himself          Docket No. 07 CV 5873 (MGC)
                and all others similarly situated,      ECF

      -against-

Copacabana Nightclub,
China Club,
A.E.R. Lounge,
Lotus,
Sol, and
Jane Doe Promoters,

          Defendants.
----------------------------------------------------------x

**PLAINTIFF CLASS MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS RULE 12(b)(6) MOTIONS TO DISMISS AND PLAINTIFF CLASS CROSS MOTIONS**

Roy Den Hollander (RDH 1957)
Attorney for plaintiff class
545 East 14 Street, 10D
New York, NY 10009
(917) 687 0652

**Table of Contents**

Preliminary Statement ……………………………………………………………….. 1

Argument ……………………………………………………………………………….. 2

    Fed. R. Civ. P. 12(b)(6) Standard …………………………………………………… 2

    State Action …………………………………………………………………………… 6

        (1) Entanglement or Entwinement …………………………………….… 10

            (a) Defendants Subject to Extensive Regulation and Licensing ……. 11

            (b) Joint Venture, Symbiotic Relationship ………………………….. 15

            (c) State Provides Subsidy to Defendants ………………………….... 17

        (2) Public Function ………………………………………………….. 19

        (3) State Authorization and Encouragement ………………………...…… 21

        (4) McSorleys' On Point ……….………………………………...…… 26

        (5) Defendants' Inapposite Cases …………………………………...……… 27

    Discrimination ……………………………………………………………….... 29

Cross Motions ……………………………………………………………………….. 29

Conclusion ……………………………………………………………………...……… 31

**Table of Authorities**

Cases

ATSI Communs., Inc. v. Shaar Fund, Ltd., 493 F.3d 87 (2d Cir. 2007) …………..…………. 3

Bell Atl. Corp. v. Twombly, 127 S.Ct. 1955, 167 L. Ed. 2d 929 (2007) ………... 3, 3 n. 4, 4, 5

Bennett v. Dyer's Chop House, Inc., 350 F.Supp. 153 (N.D. Ohio 1972) …………………… 6

Blum v. Yaretsky, 457 U.S. 991, 102 S. Ct. 2777, 73 L. Ed. 2d 534 (1982) ……...…… 24, 25

Brentwood Acad. v. Tenn. Secondary Sch. Ath. Ass'n, 531 U.S. 288, 121 S. Ct. 924,

148 L. Ed. 2d 807 (2001) ………………………………………………………… 7, 10

Bright v. Isenbarger, 445 F.2d 412 (7th Cir. 1971) …………………………..…..…..……… 6

Burton v. Wilmington Parking Authority, 365 U.S. 715, 81 S. Ct. 856,
6 L. Ed.2d 45 (1961) ………………………..……....…..…… 9, 15, 16, 17, 22, 23, 28, 29

Civil Rights Cases, 109 U.S. 3, 3 S. Ct. 18, 27 L. Ed. 835 (1883) ……………..……..…..…. 19

Coleman v. Wagner College, 429 F.2d 1120 (2d Cir. 1970) ……………......…. 15, 17, 23, 27

Comiskey v. JFTI Corp., 989 F.2d 1007 (8th Cir. 1993) ………………….……...…….. 26 n. 7

Conley v. Gibson, 355 U.S. 41, 78 S. Ct. 99, 2 L. Ed. 2d 80 (1957) …………..…...…….. 3 n. 4

Craig v. Boren, 429 U.S. 190, 97 S. Ct. 451, 50 L. Ed. 2d 397 (1976) ………..…..……. 7, 26

Edmonson v. Leesville Concrete Co., 500 U.S. 614, 111 S. Ct. 2077,
114 L. Ed. 2d 660 (1991) …………………………………………………………. 7, 8, 9, 11

Erickson v. Pardus, 127 S. Ct. 2197, 167 L. Ed. 2d 1081 (2007) ……………………………... 2

Evans v. Newton, 382 U.S. 296, 86 S. Ct. 486, 15 L. Ed. 2d 373 (1966) …………………… 20

Flagg Bros., Inc. v. Brooks, 436 U.S. 149, 98 S. Ct. 1729, 56 L. Ed. 2d 185 (1978) ……….. 21

Gaddis v. Wyman, 304 F. Supp. 713 (S.D.N.Y. 1969) ………………………………………... 2

Ganino v. Citizens Utils. CO., 228 F.3d 154 (2d Cir. 2000) ………………………………….. 3

Goesart v. Cleary, 335 U.S. 464, 69 S. Ct. 198, 93 L. Ed. 163 (1948) ……………………… 12

Gregory v. Daly, 243 F.3d 687 (2d Cir. 2001) …………………………………………... 4, 5

Hadges v. Yonkers Racing Corp., 918 F.2d 1079 (2d Cir. 1990) ……………………….. 27, 28

Hernandez v. Coughlin, 18 F.3d 133 (2d Cir. 1994) …………………………….…………… 5

Hishon v. King & Spalding, 467 U.S. 69, 104 S. Ct. 2229, 81 L. Ed. 2d 59 (1984) ..……. 3 n. 4

H. J. Inc. v. Northwestern Bell Tel. Co., 492 U.S. 229, 109 S. Ct. 2893,
106 L. Ed. 2d 195 (1989) …………………………………………………….……… 3 n. 4

Iqbal v. Hasty, 490 F.3d 143 (2d Cir. 2007) ………………………………….......……… 3, 4, 5

Jackson v. Metropolitan Edison Co., 419 U.S. 345, 95 S. Ct. 449,

42 L. Ed. 2d 477 (1974) …………………………………………………………….. 21

J.E.B. v. Ala. ex rel. T.B., 511 U.S. 127, 114 S. Ct. 1419, 128 L. Ed. 2d 89 (1994) …… 8 n. 6

Kahan v. Rosentiel, 424 F.2d 161 (3rd Cir. 1970) ……………………………………… 2

Katz's Delicatessen, Inc. v. O'Connell, 302 N.Y. 286, 97 N.E.2d 906 (1951) …………..... 16

Kotch v. Board of River Port Pilot Comm'rs, 330 U.S. 552, 67 S. Ct. 910,
91 L. Ed. 1093 (1947) …………………………………………………………… 28

Leeds v. Melts, 85 F.3d 51 (2d Cir. 1996) ……………………………………..…… 24

Male v. Crossroads Associates, 337 F.Supp. 1190 (S.D.N.Y. 1971) ………………………... 6

Marsh v. Alabama, 326 U.S. 501, 66 S. Ct. 276, 90 L. Ed. 265 (1946) ……………………… 19

Moose Lodge No. 107 v. Irvis, 407 U.S. 163, 92 S. Ct. 1965,
32 L. Ed. 2d 627 (1972) …………………………………………….…………………… 7, 12, 13, 14

National Collegiate Athletic Assn. v. Tarkanian, 488 U.S. 179, 109 S. Ct. 454,
102 L. Ed. 2d 469 (1988) …………………………………………………………….... 9, 10

Norwood v. Harrison, 413 U.S. 455, 93 S. Ct. 2804, 37 L. Ed. 2d 723 (1973)……………... 19

Powe v. Miles, 407 F.2d 73 (2d Cir. 1968) …………………………………………... 14, 15

Reitman v. Mulkey, 387 U.S. 369, 87 S. Ct. 1627, 18 L. Ed.2d 830 (1967) ………………... 22

San Francisco Arts & Ath. v. United States Olympic Comm., 483 U.S. 522,
107 S. Ct. 2971, 97 L. Ed. 2d 427 (1987) …………………………………………… 10

Scheuer v. Rhodes, 416 U.S. 232, 94 S. Ct. 1683, 40 L.Ed.2d 90 (1974) …………………… 4

Seagram & Sons, Inc. v. Hostetter, 16 N.Y.2d 47, 262 N.Y.S.2d. 75,
201 N.E.2d 701 (1965) ………………………………………………….……..…… 11, 21

Seidenberg v. McSorleys' Old Ale House, Inc.,
317 F. Supp. 593 (1970) …………..……………...... 6, 13, 14, 15, 17, 18, 22, 23, 25, 26, 28

Seidenberg v. McSorleys' Old Ale House, Inc., 308 F. Supp. 1253 (1969) ……...…... 6, 12, 26

Shelley v. Kraemer, 334 U.S. 1, 68 S. Ct. 836, 92 L. Ed. 1161 (1948) ………..…………… 13

United States v. Guest, 383 U.S. 745, 86 S. Ct. 1170, 16 L.Ed.2d 239 (1969) …………….. 22

United States v. Va., 518 U.S. 515, 116 S. Ct. 2264, 135 L. Ed. 2d 735 (1996) …………… 27

Weisman v. Lelandais, 532 F.2d 308 (2d Cir. 1976) ………………………………………… 4

William H. Van Vleck, Inc. v. Klein, 50 Misc. 2d 622, 271 N.Y.S.2d 64 (Sup. Ct. 1966) .... 18

Statutes

Alcoholic Beverage Control Law ……………………….…………………...………… 8, 10, 13, 18

Fed. R. Civ. P. 12(b)(6) …………………………………………………………………… 2, 3

Fed. R. Civ. P. 15(a) …………………………………………………………….……………… 2

N.Y. Civ. Rights §§ 40, 40-c ...…………………………………………..………...………… 10, 23

State Liquor Authority Rules, 9 NYCRR Exec. …………………………....…….. 8, 10, 13, 23

Other

Black's Law Dictionary …………………………………………………………………... 16, 17

George Orwell's Animal Farm …….…………………………………..…………….... 30

Potter Stewart, Or Of The Press, 26 Hastings L.J., 631, 634 (1974) ………………………. 24

SLA website License Classes ………………………………………………………… 14

Webster's New World Thesaurus …..……………………………………………………….. 3

## PRELIMINARY STATEMENT

The defendants failed to abide by Judge Cedarbaum's rules requiring the receipt of motions by noon at least 22 days before the return date.  Individual Practices Judge Cedarbaum, 3. MOTIONS C. ("Motions **must** be received by all parties by noon at least 22 days before the return date.")(emphasis added).

At the October 3rd conference, Judge Cedarbaum set a return date of November 29th for the defendants' motions to dismiss.  That meant all the defendants' motions "must" have been received by the plaintiff class by noon on November 7th.  They were not.  The plaintiff class[1], did not receive the motion from Sol, represented by attorney Grossman, via the Court's ECF system until 5:13 PM and Lotus' motion, represented by attorney Donovan, until 7:44 PM on November 7th.[2]  As for attorney Grossman, this is the second time he has not abided by the Judge's time deadlines.  Previously, he submitted his Declaration in Opposition to the recusal motion at 5:52 PM on the day it was due—not 12 noon.  He was notified in the plaintiff class' Reply Affirmation ¶ 21 that his declaration would be ignored for failure to abide by the rules.  Attorney Donovan, who has practiced in the federal courts for 20 years, should, of all persons, know by now to carefully read a Judge's rules.  Given the animosity in these proceedings, the two defense attorneys are most likely playing the usual childish games to hassle their opponents.  Attorneys Donovan and Grossman have had over a month to prepare their motions.  There is simply no excuse for not meeting the deadline.[3]  The plaintiff class requests that the two defendants' motions to dismiss be declared a nullity—either the rules mean something or they don't.

---

[1] Class counsel and named plaintiff or class representative for the putative class is Roy Den Hollander.
[2] Attorney Grossman served another memorandum of law on November 12—five days late and without any explanation.
[3] Attorney Elliott for A.E.R. Lounge diligently filed her motion to dismiss well before any deadline.

Throughout this memorandum, the term "plaintiff class" is used to refer to the putative class of men invidiously discriminated against by the defendants for charging guys more for admission than ladies or making a guy's admission more timely or economically burdensome than for females.  At the October 3rd conference, Judge Cedarbaum turned this putative class action into a *pro se* case.  Under the law, however, "[t]he determination whether there is a proper class does not depend on the existence of a cause of action," and "a suit brought as a class action should be treated as such for purposes of dismissal or compromise, until there is a full determination the class is not proper."  *See e.g.* <u>Kahan v. Rosentiel</u>, 424 F.2d 161, 169 (3rd Cir. 1970); <u>Gaddis v. Wyman</u>, 304 F. Supp. 713, 715 (S.D.N.Y. 1969).  Since there is no ruling that the putative class is not proper, this case remains a class action with class counsel and not a *pro se* proceeding.  This benefits both the Court and defendants because a complaint filed by a *pro se* plaintiff is held to a less stringent standard, which would make dismissal less likely.  <u>Erickson v. Pardus</u>, 127 S. Ct. 2197, 2200, 167 L. Ed. 2d 1081 (2007)(citation omitted).

Fed. R. Civ. P. 15(a) grants the plaintiff class the right to amend the original complaint once prior to service of a responsive pleading.  Since a motion to dismiss is not a responsive pleading, the plaintiff class takes this opportunity to file and serve its First Amended Complaint, <u>Exhibit 1</u>.  If this Court finds the First Amended Complaint (hereafter "Complaint") insufficient and decides to dismiss this action, <u>the plaintiff class requests leave to file a Second Amended Complaint that meets this Court's objections</u>.

## ARGUMENT

### Fed. R. Civ. P. 12(b)(6) Standard

Three attorneys for the five defendants have submitted motions to dismiss under Fed. R. Civ. P. 12(b)(6):  Attorneys Donovan (Lotus), Elliott (A.E.R. Lounge), and Grossman (Sol).  Not

one of them has cited the correct, current standard in this circuit and the U.S. Supreme Court for determining motions to dismiss—the "plausibility standard," which actually favors the defendants—not a minor oversight for their clients.[4]  Iqbal v. Hasty, 490 F.3d 143, 157-58 (2d Cir. 2007).  As a courtesy, I will do it for them in the following paragraphs so they can get it right in their replies.

In deciding a Fed. R. Civ. P. 12(b)(6) motion to dismiss in the Second Circuit, a district court accepts all factual allegations in the complaint as true and draws all reasonable inferences in the plaintiff class' favor.  ATSI Communs., Inc. v. Shaar Fund, Ltd., 493 F.3d 87, 98 (2d Cir. 2007)(citing Ganino v. Citizens Utils. CO., 228 F.3d 154, 161 (2d Cir. 2000).  Further, a court may consider any written instrument attached to the complaint, statements or documents incorporated into the complaint by reference, legally required public records, and documents possessed by or known to the plaintiff class and upon which it relied in bringing the suit.  ATSI Communs., Inc. at 98.

To survive dismissal, the plaintiff class must provide the grounds upon which its claim rests through factual allegations sufficient "to raise a right to relief above the speculative level." ATSI Communs., Inc., 493 F.3d at 98 (citing Bell Atl. Corp. v. Twombly, 127 S.Ct. 1955, 1965, 167 L. Ed. 2d 929 (2007)).  The complaint must provide "plausible grounds"[5]  for the allegations with "enough fact to raise a reasonable expectation that discovery will reveal evidence" to

---

[4] Attorneys Elliott and Grossman cite to the statement in Conley v. Gibson, 355 U.S. 41, 45-46, 78 S. Ct. 99, 2 L. Ed. 2d 80 (1957), that a dismissal motion should be granted if "it appears beyond doubt the plaintiff can prove no set of facts which would entitle him to relief."  (Elliott Law Memorandum p. 1, Grossman p.5).  Attorney Donovan in her law memorandum at p. 2 makes the same cite only a little more circuitously by citing H. J. Inc. v. Northwestern Bell Tel. Co., 492 U.S. 229, 249-50, 109 S. Ct. 2893, 106 L. Ed. 2d 195 (1989), which in turn cites Hishon v. King & Spalding, 467 U.S. 69, 73 (1984), which sends us on to the Conley statement about "no set of facts".  The U. S. Supreme Court put that standard into "retirement" this year in Bell Atl. Corp. v. Twombly, 127 S. Ct. 1955, 1969, 167 L. Ed. 2d 929 (2007).  A simple click on the "Shepards" button by either of these defense attorneys would have disclosed that.

[5] Plausible means that which at first glance appears to be true, reasonable, valid but which may not be so.  Webster's New World Thesaurus p. 740, under "specious", 1999.

support them.  Bell Atl. Corp. v. Twombly, 127 S. Ct. 1955, 1965.  This is not a heightened standard but requires a "flexible 'plausibility standard,' which obliges a pleader to amplify a claim with some factual allegations in those contexts where such amplification is needed to render the claim plausible."  Iqbal v. Hasty, 490 F.3d at 157-58.  A complaint should place allegations in a context that raises suggestions of facts required for a cause of action, Bell Atl. Corp. v. Twombly, 127 S. Ct. at 1966, and provide enough facts to state a claim that is plausible on its face, id. at 1974.  Complaints may contain either direct or inferential allegations as to all the material elements of a legal theory.  Id. at 1969.  The courts, however, are not required to conjure up a fact situation that might turn a speculative unconstitutional action into a real one.  Id. at 1969.  The plaintiffs need nudge their claims across the line from conceivable to plausible.  Id. at 1974.

While detailed factual allegations are not necessary, a complaint requires more than labels or recitation of the elements of a cause of action.  Bell Atl. Corp. v. Twombly, 127 S. Ct. 1955, 1964-65.  Vague, conclusory, naked, bald assertions and conclusions of law are statements devoid of facts upon which a court could find a civil rights violation.   Gregory v. Daly, 243 F.3d 687, 692 (2d Cir. 2001).   Some legal conclusions, however, are permissible when the defendant is given notice of the date, time and place of the alleged illegal conduct.  Iqbal v. Hasty, 490 F.3d 143, 156.   Other conclusory allegations can be resolved by a defendant's  motion for a more definite statement, or tightly controlled reciprocal discovery.  Iqbal v. Hasty, 490 F.3d 143, 158.

"[I]t may appear on the face of the pleading that a recovery is very remote and unlikely but that is not the test." Weisman v. Lelandais, 532 F.2d 308, 311 (2d Cir. 1976)(per curiam) (quoting Scheuer v. Rhodes, 416 U.S. 232, 236, 94 S. Ct. 1683, 40 L.Ed.2d 90 (1974)).  A

complaint cannot be dismissed based on a judge's disbelief of the factual allegations even if it strikes a judge that actual proof is improbable.  Bell Atl. Corp. v. Twombly, 127 S. Ct. at 1965. "This standard is applied with even greater force where the plaintiff alleges civil rights violations . . . ."  Hernandez v. Coughlin, 18 F.3d 133, 136 (2d Cir. 1994).  In civil rights actions concerning sexual discrimination, it is enough to assert facts and reasonable inferences so that when construing the complaint liberally and in the plaintiff class's favor, a court could infer a violation.  Gregory v. Daly, 243 F.3d 687, 692 (2d Cir. 2001).

District Courts retain the power to insist upon some specificity in pleading before allowing cases to proceed where massive discovery is likely to create unacceptable settlement pressures.  Bell Atl. Corp. v. Twombly, 127 S. Ct. 1955, 1966-67.  The pleading standards in Bell Atlantic may be limited to such cases.  Iqbal v. Hasty, 490 F.3d at 157.

Discovery in this case will in no fashion reach the sprawling, costly, and hugely time-consuming levels that the Supreme Court expressed concern about in Bell Atl. Corp. v. Twombly, 127 S. Ct. 1955, 1966-67.  (Re:  Proposed Case Management Plan submitted by the Plaintiff Class).  Nor would discovery create an "*in terrorem* increment of the settlement value," id. at 1966, forcing the defendants to settle for unjust demands.  All the Complaint asks is that the defendants stop invidiously discriminating against men and nominal damages of say one dollar to the class as a whole.  Not exactly a request to strike fear into the hearts of lucrative businesses, but it may aggravate all those ladies that guys are currently subsidizing to party at the defendants' discos.  Discovery in this case will provide specific, admissible evidence to prove the Complaint's allegations with respect to each defendant.

A fair reading of the Complaint will show that its bones have flesh, any nakedness is clothed, bald spots grow hair, specters of speculation are exorcised, factual allegations amplify

nine pages, some pre-discovery evidence lay in the exhibits, legal conclusions are unmasked to

reveal factual assertions going to the elements of state action and invidious discrimination, and

the conceivable crosses the line untouched, not to the plausible, but to reality.   Admittedly, there

is no concrete in the Complaint's pages to drag the defendants under financially, just specific

factual allegations.

**State Action**

If the three defense attorneys argued the wrong motion to dismiss standard—one that

<u>didn't</u> benefit their clients—why should this Court believe they have gotten the state action

requirement right?  Especially, when two different judges in this very same Court (S.D.N.Y.)

found state action in an identical situation as here—premises over which the New York State

Liquor Authority ("SLA") exercises pervasive regulation and control of the sale of alcohol for

on-premise consumption.  <u>Seidenberg v. McSorleys' Old Ale House, Inc.</u>, 317 F. Supp. 593

(1970)(Mansfield, J. granted plaintiff's motion for summary judgment); <u>Seidenberg v.</u>

<u>McSorleys' Old Ale House, Inc.</u>, 308 F. Supp. 1253 (1969)(Tenney, J. denied defendant's

motion for a Rule 12(b)(6) dismissal).

Further, had the same defense attorneys taken the time to Shepardize the <u>McSorleys'</u>

decisions, something they also failed to do with <u>Conley</u>, they would have learned that the

<u>McSorleys'</u> decisions have not been overruled or criticized on the state action issue, and the

decisions have actually been approved in other cases for the existence of state action as a result

of New York State's pervasive control over those licensed to sell alcohol:  <u>Male v. Crossroads</u>

<u>Associates</u>, 337 F.Supp. 1190 (S.D.N.Y. 1971), <u>Bennett v. Dyer's Chop House, Inc.</u>, 350 F.Supp.

153 (N.D. Ohio 1972), *see* <u>Bright v. Isenbarger</u>, 445 F.2d 412 (7th Cir. 1971).  Even the U.S.

Supreme Court in <u>Craig v. Boren</u> cited to the 1970 <u>McSorleys'</u> case for the proposition that

"federal and state courts uniformly have declared the unconstitutionality of gender lines that restrain the activities of customers of state-regulated liquor establishments…." <u>Craig</u>, 429 U.S. 190, 208, 97 S. Ct. 451, 50 L. Ed. 2d 397 (1976).  This decision came four years after <u>Moose Lodge No. 107 v. Irvis</u>, 407 U.S. 163, 92 S. Ct. 1965, 32 L. Ed. 2d 627 (1972), which dealt <u>not</u> with a New York regulatory scheme <u>nor</u> a public accommodation as does this case.

Another error the defense attorneys, especially Deborah Donovan, make is emphasizing that their clients are private entities; therefore, the discos' abridging of individual rights does not involve state action.  Privately owned and operated is not the determining factor for state action purposes:  "the character of a legal entity is determined neither by its expressly private characterization in statutory law, nor by the failure of the law to acknowledge the entity's inseparability from recognized government officials or agencies."  <u>Brentwood Acad. v. Tenn. Secondary Sch. Ath. Ass'n</u>, 531 U.S. 288, 296, 121 S. Ct. 924, 148 L. Ed. 2d 807 (2001)(citation omitted).  Just because the defendants are corporate or partnership entities under New York law does not mean state action is lacking.

The Supreme Court analysis for finding state action looks at whether the asserted constitutional deprivation resulted from the exercise of a right or privilege having its source in state authority and whether the ostensibly private actor can be described as a state actor. <u>Edmonson v. Leesville Concrete Co.</u>, 500 U.S. 614, 620, 111 S. Ct. 2077, 114 L. Ed. 2d 660 (1991).  In finding whether the actions of the ostensibly private actor can be described as a person acting with state action, the Court examines three areas:  (1) the extent of contacts by which the private actor relies on state assistance and benefits, often described as entanglement or entwinement; (2) whether the private party performs a traditional state function; and (3) whether

the discrimination is aggravated in some unique way by the incidents of state authority. Edmonson, 500 U.S. 614, 621-22.

Edmonson concerned the use of preemptory jury challenges to keep persons of a particular color off a jury. In finding state action by the private defendant who exercised the challenges, the Supreme Court reasoned that preemptory challenges for selecting a jury have no use outside the jury system, a system that the government alone administers, Edmonson, 500 U.S. 614, 622; therefore, the discrimination by the private defendant amounted to state action.[6] In New York State, the system through which alcohol is sold for on-premise consumption is administered solely by the State, which authorizes the privilege to the defendants to sell alcohol. N.Y. Alcoholic Beverage Control Law ("ABC Law"), § 2. Statutes and rules prescribe many of the details for the jury system, Edmonson, 500 U.S. 614, 622-23, as with the sale of alcohol for on-premise consumption in New York, ABC Law, State Liquor Authority Rules, 9 NYCRR Exec., Subtitle B ("SLA Rules").

In Edmonson, "[A] private party could not exercise its preemptory challenges absent overt, significant assistance of the court," 500 U.S at 624, and the defendant discos could not exercise their admission practices without the direct and indispensable participation of the SLA. Without the SLA's stamp of approval that the defendants have abided by all the State's laws and rules, no one would seek admission to the discos because there would be no alcohol to drink. Even temperance unionists would not show up because other discos serving alcohol would have more people to choose from. In addition, investors would not invest, unless looking for a tax write off or to launder cash. Private parties, the defendants, have become state actors for the purpose of reaping the benefits of selling alcohol, just as the private defendant in Edmonson

---

[6] The Supreme Court extended its holdings in Edmonson to discrimination against males in the jury selection process in J.E.B. v. Ala. ex rel. T.B., 511 U.S. 127, 114 S. Ct. 1419, 128 L. Ed. 2d 89 (1994).

became a state actor in order to benefit from the legislative authorization of preemptory challenges, Edmonson, 500 U.S. at 621.  As with the court in Edmonson, New York State's allowance of discriminatory admission policies by the defendant discos has not only made New York a party to the biased conduct, but the State also has elected to place its power and prestige behind invidious discrimination.  Edmonson, 500 U.S. at 624 (citing Burton v. Wilmington Parking Authority, 365 U.S. 715, 725, 81 S. Ct. 856, 6 L.Ed.2d 45 (1961)).  New York State's laws and rules have created a legal framework that governs the defendants' discriminatory practices, delegates to the defendants the authority to sell alcohol, and the State knowingly benefits from the revenues raised at Ladies Nights.  National Collegiate Athletic Assn. v. Tarkanian, 488 U.S. 179, 192, 109 S. Ct. 454, 102 L. Ed. 2d 469 (1988)(citations omitted).  All of which involves the State with the defendants' invidious discrimination against men.

The state action analysis has no formal test for the amount of contacts with the government that will subject a private person's activities to the restrictions of the U.S. Constitution.  The Supreme Court decides state action issues on a case by case basis.  In applying the Supreme Court's analysis, it does well to keep the following quote of Mr. Justice Clark in mind:

> "Because the virtue of the right to equal protection of the laws could lie only in the breadth of its application, its constitutional assurance was reserved in terms whose imprecision was necessary if the right were to be enjoyed in the variety of individual-state relationships which the Amendment was designed to embrace. For the same reason, to fashion and apply a precise formula for recognition of state responsibility under the Equal Protection Clause is an 'impossible task' which 'This Court has never attempted.' [citation omitted]  Only by sifting facts and weighing circumstances can the nonobvious involvement of the State in private conduct be attributed its true significance."  Burton, 365 U.S. at 722.

(1) Entanglement or Entwinement

The entanglement or entwinement analysis focuses on the number and types of contacts between the government and the ostensibly private wrongdoer or the practices that allegedly violate the U.S. Constitution. The more the contacts, the less they need to directly connect with the deprivation of rights; the fewer the contacts, the closer in proximity they need to be to the abridgement of rights.

In Brentwood Academy v. Tennessee Secondary School, the U.S. Supreme Court used a state action test of "entwinement" between state government officials and an association of public and private secondary schools that regulated interscholastic athletic competition. According to the Court, "public entwinement in the management and control of … corporations," Brentwood, 531 U.S. at 297, "support a conclusion that an ostensibly private organization ought to be charged with a public character …," Brentwood, 531 U.S. at 302. The line between private and state action is drawn, in part, to avoid the imposition of responsibility on a state for conduct it could not control. Id. 531 U.S. at 295(citing Tarkanian, 488 U.S. 179, 191). The SLA has plenty of control over the defendants, such as forbidding discrimination on the basis of color, religion, or creed, ABC § 65(4) and requiring defendants to abide by State laws and regulations, ABC § 64 (6-a)(f); SLA 9 NYCRR § 48.3, such as the Civil Rights Law §§ 40 and 40-c that forbid discrimination in public accommodations based on sex.

In determining whether entwinement exists, the courts look to three categories of relationship between the nominally private actor and the state. See San Francisco Arts & Ath. v. United States Olympic Comm., 483 U.S. 522, 542, 107 S. Ct. 2971, 97 L. Ed. 2d 427 (1987)(the Court found no state action because the government could not exercise de facto control over the private actor, which contrasts to the SLA's exercise of de jure control over the defendants).

Whether all three categories are satisfied or just one or two does not provide the answer for state action because, once again, it depends on the totality of the facts and circumstances and the degree to which the categories listed below are satisfied.

*(a) Defendants Subject to Extensive Regulation and Licensing*

Just because a private actor is licensed and regulated by a state does not mean state action, but neither does it mean <u>no</u> state action.  "[G]overnmental authority may dominate an activity to such an extent that its participants must be deemed to act with the authority of the government and, as a result, be subject to constitutional constraints."  <u>Edmonson</u>, 500 U.S. 614, 620.

Retailers of alcohol for on-premise consumption are distinguishable from other business's that pay a tax or fee for a license to operate because of the ubiquitous and pervasive involvement of the State and nature of the alcohol industry.  The defendants, commercial enterprises engaged in voluntarily serving the public, operate in an area—often considered harmful and unnecessary, where the State's regulatory power is far broader than in the case of an ordinary lawful business essential to the conduct of human affairs.  The relationship between New York State and the defendants goes well beyond just issuing the defendants a license to sell alcohol.  As the New York Court of Appeals stated in <u>Seagram & Sons, Inc. v. Hostetter</u>, 16 N.Y.2d 47, 56, 262 N.Y.S.2d. 75, 79, 201 N.E.2d 701, 704 (1965):

> "A long history of regulation, control, price fixing, place of time and sale setting, and outright extinction lies behind the liquor business in this country since Colonial times, and it is too late today to suggest that the rights of those who choose to engage in it are on a constitutional or legal parity with the rights of people who trade in bicycles, or cosmetics, or furniture."

11

And as Justice Frankfurter said in <u>Goesart v. Cleary</u>, 335 U.S. 464, 465, 69 S. Ct. 198, 93 L. Ed. 163 (1948): "The Fourteenth Amendment did not tear history up by the roots, and the regulation of the liquor traffic is one of the oldest and most untrammeled of legislative powers."

"[W]hen a significantly restricted and regulated license is granted by the State to exercise a privilege of serving the public where that privilege would be impermissible without such license, there may well exist sufficient State involvement to make the acts of the licensee those of the State itself." <u>McSorleys'</u>, 308 F.Supp. at 1258. Without State approval, the defendants could not sell alcohol, and without alcohol the discos would fail economically. So in order to survive and make their owners money, the discos comply with New York's pervasive regulatory scheme that dominates the on-premise consumption of alcohol to such a degree, that the discos' every move evinces State authority and control.

The defendants rely on <u>Moose Lodge No. 107 v. Irvis</u>, 407 U.S. 163, 92 S. Ct. 1965, 32 L. Ed. 2d 627 (1972), to argue that the SLA regulation of the defendants does not reach the level of state entwinement. Moose Lodge had been issued a "private club license" by the State of Pennsylvania to serve alcohol. The Supreme Court explicitly distinguished <u>Moose Lodge</u> from <u>Burton</u>, which the <u>McSorleys'</u> decisions rely on, by stating, "[u]nlike <u>Burton</u>, the Moose Lodge building is located on land owned by it, not by any public authority. Far from apparently holding itself out as a place of public accommodation, Moose Lodge quite ostentatiously proclaims the fact that it is not open to the public at large… In short, while [in <u>Burton</u> there] was a public restaurant in a public building, Moose Lodge is a private social club in a private building." <u>Moose Lodge</u>, 407 U.S. at 175. The Supreme Court found in <u>Moose Lodge</u> that the amount of contacts weren't as pervasive as for a public accommodation, such as the restaurant in <u>Burton</u>. The fewer the contacts, the more closely associated those contacts must be with the

discriminatory conduct, and in <u>Moose Lodge</u>, because of the private nature of the club, they weren't.

New York State's regulation of the sale of alcohol for on-premise consumption by public accommodations are more extensively controlled than for private clubs. (Complaint ¶ 11, <u>Exhibit 1</u>). The fundamental difference in New York State between a private club and public accommodation is reflected in the ABC Law and SLA Rules that regulate private club licensees less strictly than discos whose premises are open to the public. <u>McSorleys'</u>, 317 F.Supp. at 604. For example, SLA Rule 9 NYCRR § 47.7(d) requires payment of a fee and prior approval for the defendant public accommodations to alter their premises in numerous ways that are considered by the SLA as "substantial". Only three such types of alterations are held "substantial" for private clubs. In addition, all "non-substantial" alterations can be made by private clubs without requesting permission in advance. SLA Rule 9 NYCRR § 47.3(f). The defendants, however, must file a request for all but certain excepted alterations. In addition, license fees for private clubs are a fraction of those for the defendants. ABC Law § 66(4).

The defendants down play the factual distinction that <u>Moose Lodge</u> dealt with a private club and not a public accommodation. The <u>Moose Lodge</u> decision, however, can be construed as resting on that sole distinction: that the Supreme Court actually held private property and associational constitutional rights as outweighing any individual's right to be served dinner and a drink at a private club. The 14th Amendment "erects no shield against merely private conduct, however discriminatory or wrongful." <u>Shelley v. Kraemer</u>, 334 U.S. 1, 13, 68 S. Ct. 836, 92 L. Ed. 1161 (1948). The defendant discos, however, in deciding to discriminate against males are hardly exercising an individual choice in the use of private property as did Moose Lodge.

Moose Lodge was not regulated under Pennsylvania's public accommodation scheme for on-premise consumption, but under a separate license for private clubs not open to the public.  Moose Lodge, 407 U.S. at 164.  New York State also has a "private club" license for applicants that wish to restrict admission to certain classes or groups of people.  (SLA website License Classes, http://abc.state.ny.us/JSP/content/classDefinitions.jsp).  In New York a private club refers to an organization of persons incorporated under the "Not-for-Profit Corporation" law or the "Benevolent Orders" law, and which is the owner, lessee or occupant of the building used exclusively for club purposes.  Id.  New York law, and perhaps Pennsylvania, specifically allows for the exclusion of groups of persons regardless of the reason, so long as the private club requirements are maintained.  It is no surprise, therefore, that Moose Lodge did not find state action, and that it is not applicable to this case, since the very purpose of a private club liquor license in New York, and perhaps Pennsylvania, is to allow individuals to associate with whom they wish as though they were in their own home. The proverbial right of a homeowner to choose whom he shall invite to dinner is in no sense bound up in the defendant discos' discrimination.  McSorleys', 317 F.Supp. at 604.  Public accommodations are not permitted to treat different groups differently—they are required to treat all their customers similarly.

Attorney Grossman argues that the state action analysis in Powe v. Miles, 407 F.2d 73 (2d Cir. 1968), applies to this case.  Powe found no state action but dealt with the issue in a disciplinary setting at a private college.  There the court rejected the argument that state financial aid to the College of Ceramics at Alfred University could provide a basis for finding state action in the suspension of students from the University at large.

The Powe court also rejected the argument that state regulation of educational standards

within the University could be held to implicate the state generally in University policies toward demonstrations and discipline.  The Second Circuit, however, would have found state action if New York "had undertaken to set policy for the control of demonstrations in all private universities or in universities containing contract colleges. (Citation omitted).  But the fact that New York has exercised some regulatory powers over the standard of education offered by Alfred University does not implicate it generally in Alfred's policies toward demonstrations and discipline."  Powe, 407 F.2d at 81.  The alcoholic regulatory scheme in New York involves the State far more extensively and intimately in the management of retailers of alcohol than the limited state regulation of educational standards in Powe involved New York in the operation of Alfred University.  McSorleys', 317 F.Supp. at 605 n. 21.  In addition, the hurdle for state action is lower when the issue evolves sex discrimination as opposed to Students for a Democratic Society ("SDS") demonstrating against the Vietnam War at an ROTC rally.  Cf. Coleman v. Wagner College, 429 F.2d 1120, 1127 (2d Cir. 1970)(Friendly, J. concurring).

*(b) Wide Range of Physical and Economic Contacts Between Defendants and State, Joint Venture, Symbiotic Relationship*

The classic joint participant or symbiotic relationship case is Burton, 365 U.S. 715.  The privately owned restaurant leased space in a government owned parking building.  The restaurant refused to serve certain persons because of the color of their skin.  The restaurant did not receive any direct aid from the government, but it did benefit from its lease of space in a government owned building and patronage from government workers, while the government benefited from rental revenues paid by the restaurant.  Although the government did not command or encourage the restaurant's discrimination, there existed the appearance of government authorization of the practices.  While the restaurant and government were not in a joint venture, they had a

15

relationship described as "symbiotic" by legal commentators.  The Supreme Court considered the totality of the circumstances to find state action.  <u>Burton</u>, 365 U.S. 715, 724-25.  When government activities and a private actor become enmeshed to their mutual benefit, the private party's practices are subject to constitutional restraint.  *Cf.* <u>Id</u>.

The defendant discos, as in <u>Burton</u>, do not receive any direct aid from the State.  But the licensing practices of the SLA do operate to restrict competition among sellers of alcohol for on-premise consumption, which results in conferring on license holders a significant state-derived economic benefit approximating the state support provided by the lease involved in <u>Burton</u>.  <u>Id.</u> at 724.

The defendant discos also benefit from operating under *de facto* franchises from New York State.  According to <u>Black's Law Dictionary</u>, 5th edition, franchise means "[a] special privilege conferred by government on … [a] corporation, and which does not belong to citizens of the country generally of common right."  Since permission from New York State to sell alcohol is not a right, but a privilege, <u>Katz's Delicatessen, Inc. v. O'Connell</u>, 302 N.Y. 286, 288-89, 97 N.E.2d 906 (1951), the defendants are in effect franchise operations of the State.  Without their franchises from the SLA, the discos would not exist.  Absent the privilege to sell alcohol, no one would attend the defendants on Ladies Nights or any other nights.

In <u>Burton</u>, the government could have affirmatively required the restaurant to abide by the 14th Amendment as a consequence of the restaurant's involvement with a government facility.  <u>Burton</u>, 365 U.S. 715 at 725.  So too, the SLA has the power under State law and its Rules to put a stop to the defendants' practices.  In fact, no State may effectively abdicate its responsibilities by either ignoring them or by merely failing to discharge them whatever the

motive may be.  Burton, 365 U.S. 715 at 725.  "It is of no consolation to an individual denied the equal protection of the laws that it was done in good faith."  Id.

The State benefits from Ladies Nights discrimination through its interest of a proprietary nature in the defendants.  One definition of "proprietary" is possessing dominion over a thing. Black's Law Dictionary, 5th ed.  The State can revoke, cancel or suspend the defendants' privilege to sell alcohol, which is the very life blood of the disco business.  But as long as the State assents to the defendants' operations, the State benefits from Ladies Nights.  Ladies nights make the defendants money; otherwise, they would not hold them.  (*See* Donovan Law Memorandum p. 10).  An amount of those funds, presently unknown without discovery, contributes to the numerous fees the SLA charges the defendants and those fees add, somewhat, to the millions over time that the State makes from its power to control the liquor industry. (Complaint ¶¶ 18, 19, Exhibit 1).

There also exists an appearance of State authorization of the defendants' discriminatory practices because the defendants prominently display their state licenses to be seen by all visitors pursuant to § 114(6) of the ABC Law.  McSorleys' 317 F. Supp. at 603.

In the present case "as in [Burton], 'the State has so far insinuated itself into a position of interdependence … that it must be recognized as a joint participant in the challenged activity, which, on that account, cannot be considered to have been so purely private as to fall without the scope of the Fourteenth Amendment.'"  Coleman v. Wagner College, 429 F.2d 1120, 1127 (2d Cir. 1970)(Friendly, J. concurring)(quoting Burton, 365 U.S. at 725).

*(c) State Provides Subsidy to Defendants*

"[T]he general restrictions with which the retail sale of alcohol [in New York] is hedged about, and in particular the restrictions imposed upon applications for new licenses,

17

operate to limit competition to a degree sufficient to render the issuance of a license a commercially valuable privilege granted by the state to the licensee." <u>McSorleys'</u> 317 F. Supp. at 602.  Without such a "commercially valuable privilege" or subsidy, the defendants would not even exist and, therefore, not be able to make money discriminating against men.

When the SLA grants an on-premise license, it uses the standard set forth in ABC Law § 2 of  "whether public convenience and advantage will be promoted by the issuance of licenses to traffic in alcoholic beverages, the increase or decrease in the number thereof and the location of premises licensed."  The State courts review of this broad power has revealed a tendency by the SLA to protect the economic interests of already licensed premises, such as the defendants, by renewing their licenses while denying applications of new entrants in the general area when licensees have made large investments and local population and usage has not increased.  *Cf. e.g.* <u>William H. Van Vleck, Inc. v. Klein</u>, 50 Misc. 2d 622, 271 N.Y.S.2d 64, 67, 69 (Sup. Ct. 1966).  In effect, the State is providing the defendants an indirect subsidy of immense economic value.  An increase in the supply of discos serving alcohol in New York County would drive down the demand for each of the individual defendant discos.

Even were this Court to find no state action, the SLA, a State agency, is itself impairing constitutional rights by providing the benefits of a license for retailing alcohol to the defendants despite their deprivation of individual rights.  The defendants receive a specialized benefit that amounts to a cash subsidy.  The defendants sell mix drinks at around $10 each, but the actual cost of such drinks are around $1.  Thanks to the SLA, the defendants have a privilege to mint julep money.  Regardless of whether the defendants have a right to act free of constitutional restraints, it is clear that the State, through the SLA, has no authority to provide valuable

privileges to those who infringe the exercise of constitutional rights.  *See,* <u>Norwood v. Harrison</u>, 413 U.S. 455, 466, 93 S. Ct. 2804, 37 L. Ed. 2d 723 (1973).

<u>(2) Public Function</u>

When a private person engages in a function traditionally associated with sovereign governments, which has been delegate to him either *de facto* or *de jure*, then that person is subject to the same limitations on freedom of action as the state.  This agency view of state action was first expressed by Justice Harlan, in his dissent to the <u>Civil Rights Cases</u>, 109 U.S. 3, 58-59, 3 S. Ct. 18, 27 L. Ed. 835 (1883).

> "In every material sense applicable to the practical enforcement of the Fourteenth Amendment, railroad corporations, keepers of inns, and managers of places of public amusement are agents or instrumentalities of the State, because they are charged with duties to the public, and are amenable, in respect of their duties and functions, to governmental regulation. It seems to me that, … a denial, by these instrumentalities of the State, to the citizen, because of his race [or sex], of that equality of civil rights secured to him by law, is a denial by the State, within the meaning of the Fourteenth Amendment. If it be not, then that race [or sex] is left, in respect of the civil rights in question, practically at the mercy of corporations and individuals wielding power under the States."

Justice Harlan's dissent found support in <u>Marsh v. Alabama</u>, 326 U.S. 501, 506, 66 S. Ct. 276, 90 L. Ed. 265 (1946), where, in holding that a State could not, consistently with the 14th Amendment, impose criminal punishment on a person for distributing religious literature on the sidewalk of a company-owned town contrary to regulations of that town's management, the Court noted:

> "Ownership does not always mean absolute dominion. The more an owner, for his advantage, opens up his property for use by the public in general, the more do his rights become circumscribed by the statutory and constitutional rights of those who use it. Thus, the owners of privately held bridges, ferries, turnpikes and railroads may not operate them as freely as a farmer does his farm. Since these facilities are built and operated primarily to benefit the

public and since their operation is essentially a public function, it is subject to state regulation."

Because the state had allowed private ownership of land to the degree of permitting a corporation to provide the functions normally belonging to a municipality, the corporation's company-owned town exercised a public function and was held accountable to the Constitution.

New York State has permitted temporary, private ownership of some of its sovereign power over alcohol by delegating to the defendants part of that authority to sell alcohol. The defendants, therefore, exercise, in part, a public function by which they are entirely dependent upon State decisions to operate their discos successfully. (Complaint ¶¶ 12 – 14, Exhibit 1). The defendants are even well compensate by the State—not directly, but indirectly because they receive a highly valuable privilege to retail alcohol on their premises for consumption. (Complaint ¶¶ 15 – 17, 43 – 46, Exhibit 1).

In another public function case, Evans v. Newton, 382 U.S. 296, 86 S. Ct. 486, 15 L. Ed. 2d 373 (1966), a city operated a park that discriminated based on color. The city transferred part of its traditional authority over running town parks to private trustees who ran the discriminating park. The Supreme Court prohibited discrimination even though the private trustees had no connection with the town. When private individuals or groups are endowed by the State with powers or functions governmental in nature, they become agencies or instrumentalities of the State and subject to its constitutional limitations. Evans v. Newton, 382 U.S. at 299.

It's the State of New York that possesses the power to engage in the business of alcohol manufacturing and selling, and it alone determines who may exercise some of that power over which it has maintained sovereignty since New York came into existence. The State could have allowed private enterprises to develop the alcohol industry, but it chose not to. The alcohol industry remains under the exclusive control of the State and has been for centuries. It is

therefore a public function.  *See* <u>Flagg Bros., Inc. v. Brooks</u>, 436 U.S. 149, 158-59, 98 S. Ct.

1729, 56 L. Ed. 2d 185 (1978)(public function exists when there exists a history of exclusive

government activity).

The defendants cite to <u>Jackson v. Metropolitan Edison Co.</u>, 419 U.S. 345, 95 S. Ct. 449,

42 L. Ed. 2d 477 (1974), for supporting their claim of insufficient connections between the State

and the discos.  The decision in <u>Jackson</u>, however, turned on the public function question.

<u>Jackson</u>, 419 U.S. at 352-53.  The Supreme Court found that the supplying of utility services is

not traditionally the exclusive prerogative of the State, and that only activities traditionally

reserved to state authority or commonly associated with state sovereignty would be considered

public functions.  <u>Jackson</u>, 419 U.S. at 353.  A quick look at history makes the reason for the

holding in <u>Jackson</u> clear.  Beginning with the Edison Electric Illuminating Company established

in 1882, power utilities in America have almost exclusively been privately owned and never

considered a government function.  But the control of alcohol is a different story.  Governments

have exclusively regulated it and even eliminated the industry going back to before the American

Revolution.  <u>Seagram & Sons, Inc. v. Hostetter</u>, 16 N.Y.2d 47, 56, 262 N.Y.S.2d 75, 70, 201

N.E.2d 701, 704.

<u>(3) State authorization and encouragement of the unconstitutional activity.</u>

Defendants argue that New York's ABC Law and SLA Rules do not facially

discriminate against men; therefore, the State does not encourage the defendants' admission

practices.  Laws and regulations discriminatory on their face are not the only way a State can

encourage invidious discrimination.  A state may encourage the continuation of a wrong

through its executive agencies.  The SLA is an executive agency of the State of New York,

which, by its significant involvement with the defendants and repeated renewal of the

defendants' licenses, puts its mark of imprimatur on discrimination during Ladies Nights and thereby encourages it and, in effect, authorizes it.

The involvement of the state does not have to be exclusive or direct, United States v. Guest, 383 U.S. 745, 755, 86 S. Ct. 1170, 16 L.Ed.2d 239 (1969), and the state does not have to expressly or specifically authorize, command or support the discriminatory conduct. McSorleys' 317 F.Supp. at 596. "Where the state has become sufficiently involved, its inaction, acquiescence or continuation of its involvement under circumstances where it could withdraw, may be sufficient." Id. (citing Burton v. Wilmington Parking Authority, 365 U.S. 715, 725). In Burton the government had not directed the private restaurant to discriminate against blacks, but it had placed the restaurant in a position in which citizens could reasonably view the restaurant's acts as authorized by an agency of the state.

Since the state action issue is determined in reference to the kind and degree of state involvement alleged, McSorleys', 317 F.Supp. at 597, the question is whether "to some significant extent the State in any of its manifestations" has become involved in the discriminatory practice under attack. Id. (citing Burton, 365 U.S. at 722). And where the state engages in conduct having the effect of encouraging, tolerating or acquiescing in the discrimination, the 14th Amendment may be invoked. Id. at 598 (citing Reitman v. Mulkey, 387 U.S. 369, 375, 87 S. Ct. 1627, 18 L. Ed.2d 830 (1967).

The defendants' properties are voluntarily serving the public and devoted to a business in which volume of patronage is essential to commercial success. "When a state licenses such an enterprise, in an area peculiarly subject to state regulation, pursuant to a statute imposing pervasive controls upon the conduct of the business, and under circumstances in which state licensing practices endow the license with a certain franchise value as well, the state's

22

involvement in the operation of defendant's business, and by implication in the [discriminatory] practice rises to the level of significance within the meaning of <u>Burton</u>." <u>McSorleys'</u>, 317 F.Supp. at 604-05. Or, as Judge Friendly said in his concurring opinion in <u>Coleman v. Wagner College</u>, 429 F.2d 1120, 1127 (2d Cir. 1970), "When a state has gone so far in directing private action that citizens may reasonably believe this to have been taken at the state's instance, state action may legitimately be found even though the state left the private actors almost complete freedom of choice."

The SLA has continued bi-annually to renew defendants' privilege to retail alcohol for on-premise consumption despite the defendants open discrimination against males. The SLA is most assuredly aware of the preferential treatment females receive on Ladies Nights, but has made no effort through the exercise of the broad authority granted it to remedy the discrimination or suspend or revoke or deny renewal of the licenses that the defendants must have in order to practice their discrimination. The State has not only abdicated its responsibility, but in repeatedly renewing licenses, affirmatively approves the discriminatory practices of the defendants—a *de facto* authorization. This directly contravenes the SLA's duty to assure the defendants conform with all applicable government regulations, 9 NYCRR § 48.3, which includes prohibiting sex discrimination in public accommodations under N.Y. Civ. Rights § 40-c.

The state's apparent acquiescence is a factor that has been considered by the Supreme Court in resolving the issue of state action in <u>Burton</u>, 365 U.S. at 725, "no State may effectively abdicate its responsibilities by either ignoring them or by merely failing to discharge them whatever the motive may be." By standing on the side lines and doing nothing to prevent the defendants from violating the New York State Law on Civil Rights, the SLA is acting in a non-

neutral fashion that encourages discrimination just as some policemen in the deep-south stood by and watched the Ku Klux Khan beat civil rights workers.

Because the defendant discos' operations are substantially curtailed by the SLA, their licenses are continually renewed by the SLA, and the defendants are required to prominently display their licenses, the constitutional harm caused men from discriminatory admission practices are exacerbated by the apparent government sanctioning of the discrimination in allowing it to take place at the defendants' premises.

Attorney Donovan uses Leeds v. Melts, 85 F.3d 51 (2d Cir. 1996) and Blum v. Yaretsky, 457 U.S. 991, 102 S. Ct. 2777, 73 L. Ed. 2d 534 (1982) on whether New York State encouraged discrimination against men by the defendants. Blum does provide for state action when there is significant encouragement by the state that is surreptitious or covert, which the State's repeated renewal of defendants' licenses may amount to. Blum, 457 U.S. at 1004. Otherwise, both cases are fundamentally different from this action.

Leeds involved the editorial decisions of a newspaper at CUNY. The Second Circuit cited to Potter Stewart in Or Of The Press, 26 Hastings L.J., 631, 634 (1974), "The primary purpose of the constitutional guarantee of a free press was … to create a fourth institution outside the Government as an additional check on the three official branches." The Second Circuit went on to state "[t]his does not imply that all newspaper decisions are shielded from constitutional scrutiny. Rather, it indicates that when a paper's editorial decision is being challenged the burden of proving state action or state coercion will be a stringent one." Leeds, 85 F.3d at 54. The defendant discos are not the press, and they do not exist independent of the State, but at the State's discretion. Furthermore, in Leeds, the State via CUNY did not have control over the newspaper's editorial decisions, Leeds, 85 F.3d at 55, and in Blum the State did not have control

over the discharge of patients from a nursing, <u>Blum</u>, 475 U.S. at 1005.  The SLA, however, has the ultimate power of economic life or death over the defendants.

Attorney Grossman argues the discrimination by the defendants is not connected to the State's permission for discos to retail alcohol.  <u>McSorleys'</u> decided that exact same issue but contrary to Mr. Grossman's position.  "The state license enables the private licensee to engage in discriminatory conduct in the exercise of its franchise rights. To put it another way, without the state license to serve [alcohol], defendant[s] here could never have discriminated …. The license … becomes a license to discriminate."  <u>McSorleys'</u>, 317 F.Supp. at 598.  The defendant discos' ability to economically survive and prosper depends on New York State's police power permitting the discos to retail alcoholic beverages for consumption on their premises. (Complaint ¶ 15, <u>Exhibit 1</u>).  Without the privilege to retail alcohol, the defendants would not be in a position to discriminate against men because without alcohol, virtually no one would frequent their discos.  The defendants would soon be out of business.  (Complaint ¶ 50, <u>Exhibit 1</u>).

Attorney Grossman tries to make much about the defendants' entrance fees being discounted.  The issue isn't how much a disco charges on a particular night, but that it charges guys more than females or makes it more timely or economically burdensome on guys to enter. (Complaint ¶ 48, <u>Exhibit 1</u>).  Invidious discrimination means treating similarly situated groups differently, in this case, based solely on sex.  Attorney Grossman also claims that because the plaintiff class members were not directly denied drinks or admission, the State is not entwined. Let's look at attorney Grossman's client Sol on a Friday night.  A guy shows up at 11:55 PM, but he only has $15 on him—he doesn't get in because the charge to him is $20.  (Complaint ¶ 61, <u>Exhibit 1</u>).  A female standing right behind him also has only $15.  She breezes right in because

admission is free for her, and inside she can spend her $15 on the drinks of her choice, or flirt with the boys for free drinks.

(4) McSorleys' On Point

The U.S. Supreme Court referred with approval to the 1970 McSorleys' decision by stating, "both federal and state courts uniformly have declared the unconstitutionality of gender lines that restrain the activities of customers of state-regulated liquor establishments…." Craig v. Boren, 429 U.S. 190, 208.  The Craig case ruled the 21st Amendment did not trump the 14th Amendment into allowing a state to set different age requirements for males and females for drinking alcoholic beverages.  The Supreme Court's approval of McSorleys', while dicta, is persuasive dicta.

Both McSorleys' decisions and Craig address the issue of state action.  The McSorleys' decisions found state action in a situation identical to this case—an establishment over which the New York SLA exercised pervasive regulation and control of the sale of alcohol for on-premise consumption.[7]  Craig cited to the 1970 McSorleys' on finding state action as a result of state control over the sale of alcohol.  Attorney Grossman tries to negate both courts' conclusions and analyzes with respect to the issue of state action by confusing them with the issue of discrimination.  He claims that because the discriminating practices in McSorleys' and Craig were the refusal to serve one sex alcohol once inside the premises, there's some legal

---

[7] Attorney Donovan refers to a number of cases in her Law Memorandum pp.11 to 14 for holding no state action involving liquor regulation in other states.  Since the determination of state action allows for no formulaic test but requires fact specific determinations, attorney Donovan should show the similarities and differences between the regulation and control of the alcohol industry in those states and New York.  But she doesn't.  She just makes conclusory statements such as, "The same is true when the relevant factors are applied to liquor licensing and regulation in New York."  (Donovan Law Memorandum p. 14).  What factors?  She doesn't specify, and that is not good enough for state action analysis.  Attorney Elliott claims that Comiskey v. JFTI Corp., 989 F.2d 1007 (8th Cir. 1993), "addressed the specific factual issues in this case."  (Elliott Law Memorandum, p. 4)  That's not possible because the bar in Comiskey was in Missouri and operated under Missouri law.

ramification for whether there's state action.  If a guy can't overcome the obstacles of entry set up by the defendants, he's in the same situation as though the barmaid denied him a drink.

Here's another way to look at attorney Grossman's argument that state action exists when a seller of alcohol for on-premise consumption refuses to serve someone because of sex once the person is inside the establishment, but not when the same seller makes it more costly or burdensome to enter his premises because of sex.  If a guy has to pay more than a female to enter a disco, then the overall cost of his drinks will be more.  If a guy has to show up earlier in order to enter a disco at the same cost as a female who can show up later—and believe me, they do show up later—then the guy will be in a disco longer.  Since time is money, the guy will in effect be paying more for his drinks than the females.  Under either scenario the guy pays more, and that's assuming he's not also buying drinks for the ladies.  As for the guy who doesn't have the extra money to pay the higher fees for entry:  he doesn't even get to the bar, but the ladies do.  Considering that females control between 50% and 60% of the wealth in this country—that doesn't seem fair nor constitutional.

(5) Defendants Inapposite Cases

Despite attorney Donovan's claim to the contrary, <u>Hadges v. Yonkers Racing Corp.</u>, 918 F.2d 1079 (2d Cir. 1990) is an extremely irrelevant case.  <u>Hadges</u> is a <u>due process</u> action dealing with whether an individual with a criminal record has a right to employment at a racetrack.  It is not a sex discrimination case under the Equal Protection Clause of the 14th Amendment, which requires an "exceedingly persuasive justification" for disparate treatment. <u>United States v. Va.</u>, 518 U.S. 515, 531, 116 S. Ct. 2264, 135 L. Ed. 2d 735 (1996).  When the level of scrutiny is high, the requirement of state action may be mitigated.  As Judge Friendly said in his concurring opinion in <u>Coleman v. Wagner College</u>, 429 F.2d at 1127, "It is

arguable—indeed, I have argued—that racial discrimination is so peculiarly offensive and was so much the prime target of the Fourteenth Amendment that a lesser degree of involvement may constitute 'state action' with respect to it than would be required in other contexts…." The McSorleys' Court found there was no logical reason for applying different principles to a case involving sex discrimination than one involving race.  317 F.Supp. at 598 n. 7.

The Hadges Court did not find state action.  It did, however, cite to the U.S. Supreme Court that the state action question "require[s] us to sift through and weigh the facts to determine whether the alleged ties between the State and the private actor are sufficiently strong to attribute the private actor's conduct to the state."  Hadges, 918 F.2d at 1081 (citing Burton v. Wilmington Parking Authority, 365 U.S. 715, 722).  To fashion and apply a precise formula for recognition of state responsibility under the Equal Protection Clause is an impossible task which the Supreme Court has never attempted.  Burton, 365 U.S. at 722 (citing Kotch v. Board of River Port Pilot Comm'rs, 330 U.S. 552, 556, 67 S. Ct. 910, 91 L. Ed. 1093 (1947)).  Defendants' reliance on Hadges fails to "sift through and weigh the facts."  The defendants illogically claim that state action concerning the pervasive regulation of them by the SLA be determined by a case dealing with a racetrack that falls under the purview of a completely different authority, the New York State Racing and Wagering Board, different law, and deals with a racetrack's refusal to hire a person found guilty of fixing races.

To argue that Hadges controls the determination of the state action issue for a fact situation involving the control of alcohol would at least require the defendants to compare not just the law and rules governing racetracks in New York State to the ABC Law and SLA Rules, but also the administration of racetrack regulation to that of the SLA's operations.  They have

not done so, and since determination of the state action issue is peculiarly fact driven, <u>Burton</u>, 365 U.S. at 722, <u>Hadges</u>, without more factual analysis, should not control.

All the cases cited by the defendants as support for finding no state action do not deal with New York State's pervasive regime of control over the sale of alcohol for on-premise consumption. The defendants' cases deal with other jurisdictions and the defendants do not provide any analysis as to the factual similarity among those states' regulatory schemes and New York's. Once again, a determination of state action requires "sifting facts and weighing circumstances." <u>Burton</u>, 365 U.S. at 722.

<u>Discrimination</u>

The Complaint accuses the defendants of invidiously discriminating against males on certain nights called Ladies Nights. On those nights, the defendants charge guys more for admission than they charge females or give males less time than females to enter defendant discos for free or at a reduced price. The Complaint at ¶ 61, <u>Exhibit 1</u>, specifically states the date, time, place, and the discos that treated the named-plaintiff male differently, based solely on his sex, than females in permitting him to enter a particular disco. Either females and males are similarly situated for partying at discos or they aren't.

## CROSS MOTIONS

The plaintiff class makes two cross motions.

The first requests this Court to instruct attorney Donovan to disclose how and when she acquired the copyrighted essays that she published, copied, and distributed by adding them to the public records of this Court. In addition, the motion requests a list of all the other persons to whom attorney Donovan distributed the essays.

In attorney Donovan's opposition to the plaintiff class' recusal motion, she attached as an exhibit six essays by the class representative, Roy Den Hollander, in an effort to litigate by inquisition—having the Court punish Mr. Den Hollander for exercising his free speech and prejudicing him by requiring the investing of time, energy and effort to address her *ad hominem* attacks. As stated in an October 29, 2007, letter to the Court from Mr. Den Hollander:

> All of the essays except one are not available to the public, and to my knowledge are only located on my personal computer and another computer, which are both connected to the Internet. Attorney Donovan's acquisition of these essays raises questions of cyber crime—hacking into Internet computers, re: 18 U.S.C. § 1030(a)(2), and copyright violation by publishing the essays in her exhibit without my permission. Exhibit 2.

Since that letter, to which there was no response by this Court, Attorney Donovan has distributed the copyrighted essays to the defendants in a defamation action Mr. Den Hollander is currently prosecuting in state court: Den Hollander v. Fasano and Steinberg, 021283 Cv 06, New York County Civil Court. Perhaps emboldened by her success in winning the recusal motion, attorney Donovan and her accomplices in copyright infringement surely hope to achieve the same result in the defamation action. The defendants in the Civil Court have submitted the exact same copies with the identical telltale markings as attorney Donovan's copies as part of their opposition to a motion to amend the defamation complaint.

The acquisition of the illegally obtained, copyrighted evidence first came to light before this Court, which chose to do nothing. Now the illegally obtained evidence and copyright violations are being spread to other courts as an apparent result of inaction by this Court and attorney Donovan's palpable malice against any man who dares exercise his rights in a way she and other feminists do not like. In an effort to put an end to these violations of the law, this motion requests this Court instruct attorney Donovan to reveal how and when she came by those essays and all others to whom she has distributed them and when.

The second cross motion requests this Court to reject attorney Donovan and attorney Grossman's motions to dismiss, including both of attorney Grossman's memoranda of law, for violating the Judges rules by serving their papers late on the ECF system—after the noon deadline on November 7th for receipt by all parties of their papers.

**CONCLUSION**

Nearly 40 years ago, two male judges in the Southern District Court of New York assured that females would be treated equally by businesses serving alcohol.  Since then, such businesses continue to freely discriminate against guys.  Perhaps in America, as in Orwell's <u>Animal Farm</u>, some are more equal than others.

The plaintiff class requests denial of the defendants' motions to dismiss.


Dated:  New York, NY                                              /S/
        November 17, 2007                            _____
                                                     Roy Den Hollander (RDH 1957)
                                                     Attorney for plaintiff class
                                                     545 East 14 Street, 10D
                                                     New York, NY 10009
                                                     (917) 687 0652