UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------------------------x
Roy Den Hollander,

        Plaintiff on behalf of himself         Docket No. 07 CV 5873 (MGC)
        and all others similarly situated,         ECF

        -against-

Copacabana Nightclub,
China Club,
A.E.R. Lounge,
Lotus,
Sol, and
Jane Doe Promoters,

        Defendants.
--------------------------------------------------------x

## PLAINTIFF CLASS SUPPLEMENTAL MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS SUPPLEMENTAL RULE 12(b)(6) MOTIONS TO DISMISS

Roy Den Hollander (RDH 1957)
Attorney for plaintiff class
545 East 14 Street, 10D
New York, NY 10009
(917) 687 0652

i

**Table of Contents**

Preliminary Statement ……………………………………………………………….. 1

Argument …………………………………………………………………………….. 3

    Fed. R. Civ. P. 12(b)(6) ……………………………………………………....... 3

    State Action …………………………………………………………………….. 7

        (1) Entwinement ………………………………………….…………....... 9

        (2) Public Function …………………………………………………….. 20

        (3) State Authorization and Encouragement ………………………....…… 24

        (4) Defendants' Misconstruing of Cases …………………………....…….. 30

    Discrimination …………………………………………………………….....… 35

    Frivolity ……………………………………………………………………….. 38

Conclusion …………………………………………………………………....……… 39

**Table of Authorities**

Cases

Am. Mfrs. Mut. Ins. Co. v. Sullivan, 526 U.S. 40,119 S. Ct. 977,
143 L. Ed. 2d 130 (1999) ………………………………………………………………… 25

ATSI Communs., Inc. v. Shaar Fund, Ltd., 493 F.3d 87 (2d Cir. 2007) …..…………………. 3

Blum v. Yaretsky, 457 U.S. 991, 102 S. Ct. 2777,
73 L. Ed. 2d 534 (1982) …………………………………………………..… 13, 14, 25, 27, 28

Brentwood Acad. v. Tenn. Secondary Sch. Ath. Ass'n, 531 U.S. 288, 121 S. Ct. 924,
148 L. Ed. 2d 807 (2001) …………………………………… 3, 4, 7, 8, 9, 11, 12, 14, 17, 24

Burton v. Wilmington Parking Authority, 365 U.S. 715, 81 S. Ct. 856,
6 L. Ed.2d 45 (1961) ……………………………………………..…….…..… 15, 16, 17, 26, 27, 33

Conley v. Gibson, 355 U.S. 41, 78 S. Ct. 99, 2 L. Ed. 2d 80 (1957) …………..…..……….. 28

Craig v. Boren, 429 U.S. 190, 97 S. Ct. 451, 50 L. Ed. 2d 397 (1976) ………..…….... 28, 39

Cranley v. Nat'l Life Ins. Co. 318 F.3d 105, 111 (2d Cir. 2003) ………………………… 7, 8

Edmonson v. Leesville Concrete Co., 500 U.S. 614, 111 S. Ct. 2077,
114 L. Ed. 2d 660 (1991) …………………………………………….……… 7 n. 4, 30

Evans v. Newton, 382 U.S. 296, 86 S. Ct. 486, 15 L. Ed. 2d 373 (1966) ……………… 22, 23

Ex parte Virginia, 100 U.S. 339, 346-47, 25 L. Ed. 676 (1880) …………………………….. 7

Ganino v. Citizens Utils. CO., 228 F.3d 154 (2d Cir. 2000) …………………..…………….. 3

Gregory v. Daly, 243 F.3d 687 (2d Cir. 2001) …………………………………………… 6

Hadges v. Yonkers Racing Corp., 918 F.2d 1079 (2d Cir. 1990) ……………………… 33, 34

Horvath v. Westport Library Ass'n, 362 F.3d 147 (2d Cir. 2004) … 7, 8, 13, 18, 20, 21, 22, 24

Iqbal v. Hasty, 490 F.3d 143 (2d Cir. 2007) …………………………………...……….....…… 6

Jackson v. Metropolitan Edison Co., 419 U.S. 345, 95 S. Ct. 449,
42 L. Ed. 2d 477 (1974) …………………………………………………………… 3, 13, 22

Lebron v. Nat'l R.R. Passenger Corp., 513 U.S. 374, 115 S. Ct. 961,
130 L. Ed. 2d 902 (1995) …………………………………………………………….....… 7

Lombard v. Louisiana, 373 U.S. 267, 83 S. Ct. 1122, 10 L. Ed. 2d 338 (1963) …………… 29

Madden v. Queens County Jockey Club, Inc., 296 N.Y. 249, 72 N.E.2d 697 (1947) …. 34, 35

Marsh v. Alabama, 326 U.S. 501, 66 S. Ct. 276, 90 L. Ed. 265 (1946) …………..……… 23, 24

Moose Lodge No. 107 v. Irvis, 407 U.S. 163, 92 S. Ct. 1965,
32 L. Ed. 2d 627 (1972) ……………………………………………………… 11 n. 7, 31, 32, 33

New York State Liquor Authority v. Bellanca, 452 U.S. 714, 715, 101 S. Ct. 2599,
69 L. Ed. 2d 357 (1981) …………………………………………………….……… 24

Norwood v. Harrison, 413 U.S. 455, 93 S. Ct. 2804, 37 L. Ed. 2d 723 (1973)……...…...… 33

NOW, Inc v. Scheidler, 510 U.S. 249, 127 L.Ed.2d 99, 114 S.Ct. 798 (1994) ……… 26 n. 11

O'Gara v. Joseph, 202 Misc. 28, 115 N.Y.S.2d 469 (1952)(Sup. Ct. Kings) ……………… 10

Oyama v. California, 332 U.S. 633, 68 S. Ct. 269, 92 L. Ed. 249 (1948) ………………… 36

Plessy v. Ferguson, 163 U.S. 537, 41 L. Ed. 256, 16 S. Ct. 1138 (1896) ………………… 20

Reed v. Reed, 404 U.S. 71, 92 S. Ct. 251, 30 L. Ed. 2d 225 (1971) …………………... 21, 36

Rendell-Baker v. Kohn, 457 U.S. 830, 102 S. Ct. 2764, 73 L. Ed. 2d 418 (1982) ……. 16, 19

Royster Guano Co. v. Virginia, 253 U.S. 412, 40 S. Ct. 560, 64 L. Ed. 989 (1920) ……... 36

Seagram & Sons, Inc. v. Hostetter, 16 N.Y.2d 47, 262 N.Y.S.2d 75,
201 N.E.2d 701 (1965), aff'd 384 U.S. 35 (1966)……………………...…………… 35, 39

Seidenberg v. McSorleys' Old Ale House, Inc.,
317 F. Supp. 593 (1970) …………………..…….. 5, 10, 12, 15, 16, 18, 22, 24, 27, 31, 35, 39

Seidenberg v. McSorleys' Old Ale House, Inc., 308 F. Supp. 1253 (1969) ….. 10, 13, 16, 39

Tancredi v. Metro. Life Ins. Co., 378 F.3d 220 (2d Cir. 2004) ……………..… 11, 12, 32, 39

United States v. Va., 518 U.S. 515, 116 S. Ct. 2264, 135 L. Ed. 2d 735 (1996) ………..… 36

Will v. Mich. Dep't of State Police, 491 U.S. 58, 109 S. Ct. 2304,
105 L. Ed. 2d 45 (1989) …………………………………………………………..... 7

William H. Van Vleck, Inc. v. Klein, 50 Misc. 2d 622,
271 N.Y.S.2d 64 (Sup. Ct. 1966) ………………………………………………… 18

## Statutes

Alcoholic Beverage Control Law ……………..…………… 12, 15, 17, 18, 21, 25, 29, 34

Fed. R. Civ. P. 12(b)(6) ………………………………………………………..… 1, 3

Fed. R. Civ. P. 15(a) …………………………………………….………… 1 n.1

N.Y. Civ. Rights §§ 40, 40-c ……………………………..………… 12, 13, 21, 25

N.Y. Exec. § 296(2)(a) ………………………………………………… 12, 13, 25

State Liquor Authority Rules, 9 NYCRR Exec. ……………...………… 12, 15, 21, 25, 29

## Other

American Heritage Dictionary, 2d College Edition ………………………………… 25 n. 10

Black's Law Dictionary ……………………………………………..…… 4, 8 n. 5

N.Y. State Moreland Commission on the Alcoholic Beverage Control Law,
Report and Recommendations, January 3, 1964 …………………………………..… 19, 35

N.Y. State Moreland Commission on the Alcoholic Beverage Control Law,
Study Paper No. 4, October 27, 1963 ……………………………………… 10, 12, 18, 19, 23

Report of the State Liquor Authority, April 12, 1933 – December 31, 1934 ……… 10, 14, 24

SLA Handbook for Retail Licensees, May 2006 …………………………………...…… 14

Webster's New World Thesaurus …...…………………………………………………… 4 n.3

Webster's Third New International Dictionary, 1999 ……………………..…………….. 27

## PRELIMINARY STATEMENT

In this, the first inning of this case, the defense attorneys have already struck out once by using the wrong legal standard for deciding motions to dismiss under Fed. R. Civ. P. 12(b)(6) and by replying only to the original complaint but not the amended complaint.[1]  The defendants requested another time at bat in the same inning, which Judge Miriam G. Cedarbaum gave them.  Perhaps this second chance will benefit the Court by resurrecting its confidence in relying on the defendants' new sets of papers and arguments.  A confidence previously undermined when the Court relied on A.E.R. Lounge's ("AER") motion to dismiss at the October 3rd preliminary conference not realizing that AER had failed to mention two Southern District of New York ("SDNY") decisions that found state action in an identical situation as here—an on-premise retailer of alcohol in New York County:  McSorleys' Tavern.  AER also had left out a U.S. Supreme Court decision that in dicta cited approvingly to the finding of state action in the McSorleys' case.  No harm done, the plaintiff class made the Court aware of the decisions and provided the citations.  But then the defense attorneys bungled again by using the wrong standard for determining a Fed. R. Civ. P. 12(b)(6) dismissal.  Apparently no harm done either, the plaintiff class enlightened the defense attorneys as to the new standard, which actually benefited their clients, and did so in a timely manner that gave the attorneys six days to correct their error and apply the new standard to the amended complaint, which they presently claim adds nothing new to the original complaint. [2]

---

[1] Defense attorney Grossman argued that Fed. R. Civ. P. 15(a) gave the defendants "ten (10) days to respond to the amended complaint…."  (Grossman Express Mail Letter to the Court, November 26, 2007).  Rule 15(a) does not say the defendants have ten days to complete their motions to dismiss after service of the amended complaint.  The rule talks about pleadings, not motions to dismiss or their replies, which are not pleadings.

[2] The plaintiff class's attorney appreciates the compliment of "Herculean efforts" (Grossman Supplemental Affirmation ¶ 3), but at this point, they appear more Sisyphean.

The defense attorneys, however, chose not to put in the required time over Thanksgiving to use their replies for applying the correct standard to the amended complaint. Instead, their replies only dealt with the original complaint when not whining for a do-over. So, the Court came to their rescue by granting their request for a second bite at the apple, which may rebuild the Court's confidence in the defendants' arguments to the point of relying on their say so— then again, nothing is certain.

This supplemental memorandum of law ("Opposition Supplemental Memorandum") by the plaintiff class argues, as does the initial memorandum of law ("Opposition Memorandum"), that the state action analyzes of Entwinement, Public Function and Encouragement are all satisfied, but if not, then the arguments are in the alternative.

In this Opposition Supplemental Memorandum of law, the defendants' first round of replies are referred to as "Grossman Reply Memorandum" (defendant Sol) and "Donovan Reply Memorandum" (defendant Lotus). AER did not submit a first round reply. The papers that amount to the defendants' second time at bat are for Sol called "Grossman Supplemental Affirmation," for A.E.R. Lounge: "Elliott Supplemental Affirmation," and for Lotus: "Donovan Supplemental Memorandum". The First Amended Complaint is referred to as the "Amended Complaint."

Since this case is about human beings rather than English pronoun-noun agreement or the adjective-noun agreement of a foreign language, the term "sex" will be used as opposed to the evolutionarily incorrect term "gender."

## ARGUMENT

**Rule 12(b)(6)**

On a Fed. R. Civ. P. 12(b)(6) motion to dismiss, the allegations in the complaint are considered true and the Court draws all reasonable inferences in the plaintiff class's favor. ATSI Communs., Inc. v. Shaar Fund, Ltd., 493 F.3d 87, 98 (2d Cir. 2007)(citing Ganino v. Citizens Utils. Co., 228 F.3d 154, 161 (2d Cir. 2000)).   Therefore, citing to the Amended Complaint for factual assertions to support the plaintiff class's Opposition Memorandum and this Opposition Supplemental Memorandum is not only appropriate but necessary.

Sol objects that the new allegations in the Amended Complaint merely recite the New York State Alcoholic Beverage Control ("ABC") Law and the New York State Liquor Authority ("SLA") Rules, and, therefore, "presents no additional *facts*".  (Grossman Supplemental Affirmation ¶¶ 3, 4 (emphasis original)).  Lotus also objects the Amended Complaint doesn't cite facts but only quotes ABC law and SLA rules.  (Donovan Supplemental Memorandum p. 1).  AER views the allegations as "pertaining to the various ways in which the State regulates," which can be read as intertwining the State and on-premise retailers of alcohol. (Elliott Supplemental Affirmation ¶ 3).

Despite the defense attorneys spin, the Amended Complaint alleges facts that demonstrate the close nexus between the defendants and the State, which is a key issue in this action.  According to one of the most recent U.S. Supreme Court decisions, state action exists when there is such a "close nexus between the State and the challenged action" that seemingly private behavior "may be fairly treated as that of the State itself."  Brentwood Academy v. Tennessee Secondary School Athletic Ass'n, 531 U.S. 288, 296, 148 L. Ed. 2d 807, 121 S. Ct. 924 (2001)(quoting Jackson v. Metropolitan Edison Co., 419 U.S. 345, 351, 95 S. Ct. 449, 42 L.

Ed. 2d 477 (1974)).  Under this standard, the Supreme Court has found state action when the

state provides "significant encouragement, either overt or covert," or when a private actor

operates as a "willful participant in joint activity with the state or its agents," or when a

nominally private entity is controlled by an "agency of the state," or when a private actor has

been delegated a public function by the state, or when the private party is "entwined with

governmental policies" or when government is "entwined in [a private actor's] management or

control."  <u>Brentwood</u>, 531 U.S. at 296(citations omitted).

Not one—not one of the defendants can claim that any of the factual allegations on the

nexus between New York State and the defendants do <u>not</u> exist.  (Complaint ¶¶ 8 – 47).  Laws

and regulations require certain conduct that takes place in reality, or prohibit conduct that in

turn results in other conduct occurring in reality.  According to <u>Black's Law Dictionary</u>, 8th ed.,

a fact is something that "actually exists; an aspect of reality".  Do the defendants claim that their

liquor licenses are not visible to customers and hanging in wood or metal frames as required by

the SLA?  Or, that any other ABC or SLA requirements have not been met in our four

dimensional time-space continuum?  Not likely.  In addition, the Supreme Court typically looks

to regulatory schemes to determine whether the facts of a particular case show a close nexus.

<i>E.g.</i> <u>Brentwood</u>, 531 U.S. at 301.

When the defendants argued for their second time at bat in the same inning, attorney

Grossman stated the plaintiff class "went from a complaint that consisted of the bare minimum

… to a detailed amended complaint that is nine pages of 67 single spaced allegations … which

cannot possibly be addressed."  (Grossman Reply p. 5).  Surely somewhere among "the

profundity of information[3] presented" (Grossman Supplemental Affirmation ¶ 4) in the

Amended Complaint there must be some additional facts despite the defense attorneys'

---

[3] A synonym for "information" is "acquired facts".  <u>Webster's New World Thesaurus</u> 1999 ed.

statements to the contrary.  If there aren't, then why did attorneys Donovan and Grossman base their request for a second chance on the filing of the Amended Complaint?  Sounds somewhat hypocritical for the defense attorneys to argue there's too much information in the Amended Complaint and later that there's not enough.

The defense attorneys also argue that some of the Amended Complaint's allegations are "baseless," such as, without an on-premise privilege to retail alcohol, the discos would not economically survive and, therefore, not be in a position to discriminate.  (Grossman Supplemental Affirmation ¶ 6, *see* Elliott Supplemental Affirmation ¶ 10).  First, on a Rule 12(b)(6) motion, the allegations in the Complaint are considered true.  Second, a decision from the SDNY states that attorneys Grossman and Elliott are wrong.  Seidenberg v. McSorleys' Old Ale House, Inc., 317 F. Supp. 593, 598 (1970)(the license becomes a license to discriminate)(citation omitted).  Third, a little common sense is required.  If the provision of alcohol wasn't crucial to the economic success of the defendants, then why would they pay hefty fees to the State and put up with bureaucrats telling them how to run their businesses?  The defendants could save all that money and avoid the red tape by serving tea instead—only then nobody would come.

Attorney Elliott (AER) theorizes the Amended Complaint has the defendants' key attraction wrong:  it's ladies who attract male customers and not alcohol.  (Elliott Supplemental Affirmation ¶ 11).  Tell that to the owners of McSorleys' before 1969.  If Lotus were a strip club, there may be some basis to Elliott's theory, but it's not.  Besides, at this stage of the proceeding, it's still the allegations in the Amended Complaint that are deemed true, not the defendants' alternative factual assertions, which are reserved for their answers.

In any event, attorney Elliott's theory doesn't reflect reality. The theory operates under a mistaken belief: that more ladies attend the defendants if given an economic break. It's not such a faulty conclusion, but the defendants fail to think it through. The premise that money matters to ladies is correct. But AER's theory fails to consider that many females aren't looking for chump change, they're looking for a chump to gold-dig. In order to find that guy with a large bank account or upward mobility, ladies need to go to where the boys are, especially in New York City were the ratio of guys to females is 9 to 10. The more boys at a disco, the greater a lady's opportunity. The ladies figure that more guys will go to a club where the admission price for guys is less and follow the boys there. They'll also figure the guys will have more money to buy them drinks at those discos.

A random sampling of New York discos will show that the break down is usually 50-50 in nightclubs that charged the same price for guys and females, but on Ladies Nights, there's usually a significantly lower percentage of females.

Finally for this Rule 12(b)(6) section, attorney Grossman points out a typo in the plaintiff class's Opposition Memorandum at p. 4. (Grossman Supplemental Affirmation ¶¶ 11, 12). In paraphrasing a proposition—not quoting—from Gregory v. Daly, 243 F.3d 687, 692 (2d Cir. 2001), the plaintiff class's attorney inadvertently left out the word "not". The sentence should read: Vague, conclusory, naked, bald assertions and conclusions of law are statements devoid of facts upon which a court could **not** find a civil rights violation. Gregory v. Daly, 243 F.3d 687, 692 (2d Cir. 2001)(citations omitted). The following sentence in the memorandum goes on to state: "Some legal conclusions, however, are permissible when the defendant is given notice of the date, time and place of the alleged illegal conduct. Iqbal v. Hasty, 490 F.3d 143, 156." The Gregory proposition was used to set up the sentence citing Iqbal because of that

sentence's importance as it relates to the specific dates, times, and places of the defendants'

discriminations.  The plaintiff class's attorney apologizes to the Judge and her clerk for this

error and commends attorney Grossman on his yeoman effort.

## State Action[4]

The purpose of civil rights actions under 42 U.S.C. 1983 is to further the public good

and to prevent injury and wrong, Will v. Mich. Dep't of State Police, 491 U.S. 58, 73, 109 S. Ct.

2304, 105 L. Ed. 2d 45 (1989)(Mr. Justice Brennan dissenting), by constraining governmental

action "by whatever instruments or in whatever modes that action may be taken." Lebron v.

Nat'l R.R. Passenger Corp., 513 U.S. 374, 392, 115 S. Ct. 961, 130 L. Ed. 2d 902

(1995)(quoting Ex parte Virginia, 100 U.S. 339, 346-47, 25 L. Ed. 676 (1880)).

In the Second Circuit, under color of law or state action requires a violation of

constitutional rights caused by the exercise of some right or privilege created by the State or by

a rule of conduct imposed by the State or by a person for whom the State is responsible, and the

person engaging in the constitutional infringement is one who may "fairly" be said to be a state

actor.  Cranley v. Nat'l Life Ins. Co. 318 F.3d 105, 111 (2d Cir. 2003)(citations omitted).  The

Second Circuit cautioned that in accordance with Brentwood, 531 U.S. at 303, the term

"responsible" is not to be read narrowly for determining state action.  Horvath v. Westport

Library Ass'n, 362 F.3d 147, 154 (2d Cir. 2004).  Further, it's the State's authority that is

relevant to the state action inquiry.  See Horvath, 362 F.3d at 154 (citing Brentwood, 531 U.S. at

400).

---

[4] "Unfortunately, our cases [Supreme Court] deciding when private action might be deemed that of the state have
not been a model of consistency."  Edmonson v. Leesville Concrete Co., 500 U.S. 614, 632, 111 S. Ct. 2077, 114
L. Ed. 2d 660 (1991) (O'Connor, J., dissenting).

The challenged conduct of an ostensibly private party may be deemed fairly attributable to the state when:  the state exercises coercive power, or the state provides the private actor with significant encouragement, either overt or covert, or the state is entwined in the management or control of the ostensibly private actor, or the private actor operates as a willful participant in joint activity with the state or its agents, or the ostensibly private actor is controlled by an agency of the state, or the private actor has been delegated a public function by the state, or the private actor is entwined with governmental policies.  Cranley v. Nat'l Life Ins. Co., 318 F.3d 105, 112 (citing Brentwood, 531 U.S. 288, 296).

None of the tests require, as attorney Grossman wrongly assumes in his Reply at p. 8, that:

- the State own the defendants, although the State has incidents of ownership[5] in that the State completely controls the defendant's economic livelihoods and must approve any transfers of ownership, change in principals, and financing; or

- the State be a partner under N.Y. Partnership Law, which requires two or more persons to carry on a business for profit in which they share the income and expenses, although the success of the defendants brings significant revenue to the State.

The tests for state action as cited by the Second Circuit are in the disjunctive and not conjunctive as that Court made plain in Horvath, 362 F.3d 147, 151 (2d Cir. 2004)(quoting Brentwood, 531 U.S. 288, 295-96):

> What is fairly attributable [to the government] is a matter of normative judgment, and the criteria lack rigid simplicity. From the range of circumstances that could point toward the State behind an individual face, no one fact can function as a necessary condition across the board for finding state action; nor is

---

[5] The "incidents of ownership" was raised in plaintiff class's Opposition Memorandum at p. 17 where it talked about an "interest of a proprietary nature".  One definition of "proprietary" is possessing dominion over a thing. Black's Law Dictionary, 5th ed, which the State surely has over the defendant on-premise retailers of alcohol.

any set of circumstances absolutely sufficient, for there may be some
countervailing reason against attributing activity to the government.

Further, "there is no single test to identify state actions and state actors." Brentwood, 531 U.S.

at 294. Rather, there are "a host of facts that can bear on the fairness of . . . an attribution" of a

challenged action to the State. Id. at 296.

The following arguments (1) to (3) are in the alternative.

(1)  The State, its policies, and ubiquitous control of the alcohol industry entwine government in
the management and control of the defendant retailers of alcohol to such an extent that they are
de facto agencies of the State.

The entwinement analysis for state action looks to the number and types of contacts

between the State and the defendants or the State and the challenged practices. Multiple

physical, economic, and regulatory contacts may so intertwine a private actor and government

that the actor will be treated as a de facto agency of the government. See Brentwood, 531 U.S.

288, 302-03. The "ambit [of the 14th Amendment] cannot be a simple line between States and

people operating outside formally governmental organizations, and the deed of an ostensibly

private organization or individual is to be treated sometimes as if a State had caused it to be

performed." Brentwood, 531 U.S. 288, 295.

Defendants argue for a simple line by alleging state action can only exist when the

"deed" treats persons differently who are trying to obtain an alcoholic drink, regardless of the

extent of contacts between the defendants and the State.[6] The nominally private character of the

defendants, however, is overborne by the pervasive entwinement of the SLA in controlling the

defendants' corporate composition, physical plant, and operations. See Brentwood, 531 U.S.

---

[6] Attorney Elliott in effect argues that some members of the class attend the defendants to drink alcohol, others to
drink presumably punch, and still others not to drink at all. (Elliott Supplemental Affirmation ¶ 12). If the Court
considers that legally important for determining state action, then it can limit the class to those who attend for an
alcoholic drink, such as the plaintiff class's counsel.

288, 298.  The ubiquitous presence of the SLA shapes the defendants' policies and makes them surrogates for the state.

At the end of prohibition, New York State chose a mechanism in the ABC Law and the SLA to establish an alcohol industry of agents strictly overseen and limited by the State.  Report of the State Liquor Authority, April 12, 1933 – December 31, 1934.  The State can at any time change the arrangement and take unto itself the functions of all its surrogates.  Seidenberg v. McSorleys' Old Ale House, Inc., 317 F. Supp. 593, 599-600 (1970); see  N.Y. State Moreland Commission on the Alcoholic Beverage Control Law, Study Paper No. 4, October 27, 1963, pp. 33, 39.  The State could even go dry if it wished as it did on January 16, 1920 with passage of the Mullen-Gage Law to enforce prohibition.  Report of the State Liquor Authority, p. 5.  The SLA doesn't just grant licenses for the sale of alcohol, but prescribes the limits and conditions for the exercise of such licenses in a field where absolute as well as conditional prohibition is permissible as an attribute of State sovereignty.  Seidenberg v. McSorleys' Old Ale House, Inc., 308 F. Supp. 1253, 1257 (1969).   The State's interest in and activity with regard to its on-premise retailers of alcohol extends far beyond any mere income-producing licensing requirement.  Report of the State Liquor Authority, pp. 5 - 11.

Under the State's regime, the defendants have no contractual rights in their continuing provision of alcohol, so they are not mere contract providers of service to the State.  O'Gara v. Joseph, 202 Misc. 28, 32, 115 N.Y.S.2d 469, 473 (1952)(Sup. Ct. Kings).  The defendants are chosen as state agents to dispense alcohol for on-premise consumption, and as agents or de facto administrative agencies of the State, their operations are tightly controlled by the State from customer noise outside, to the visibility inside, to the number of toilets, to the number of chairs, to the age and citizenship of employees, to the people with whom the owners associate, to the

10

owners' spouses, to the personal character of the owners, to financing, to renovation, to signs, to criminal records of employees, and so on. The entwinement down from the SLA to the defendants is unmistakable. "Entwinement will support a conclusion that an ostensibly private organization ought to be charged with a public character and judged by constitutional standards; entwinement to the degree shown here requires it." Brentwood, 531 U.S. 288, 302.

Entwinement can be found even though the criteria from other tests may not be satisfied on the facts. Brentwood, 531 U.S. 288, 303:

> "[I]t avails the [defendants] nothing to stress that the State neither coerced nor encouraged the actions complained of. 'Coercion' and 'encouragement' are like 'entwinement' in referring to kinds of facts that can justify characterizing an ostensibly private action as public instead. Facts that address any of these criteria are significant, but no one criterion must necessarily be applied. When, therefore, the relevant facts show pervasive entwinement to the point of largely overlapping identity, the implication of state action is not affected by pointing out that the facts might not loom large under a different test."

In Tancredi v. Metro. Life Ins. Co., 378 F.3d 220, 229-30 (2d Cir. 2004), the Second Circuit stated that Brentwood suggests an expansive view of state action by broadening the state action test to included entwinement.[7] The Second Circuit also stated that state action under the entwinement test exists even though "the facts would not [have] supported a finding of state action under various criteria applied in other cases," such as Coercion and Encouragement. Id.

Under the entwinement analysis, therefore, it does the defendant retailers of alcohol no good to argue that the State did not coerce, require, command, enforce, establish, sponsor or encourage the specific activity of the defendants. The Amended Complaint alleges

---

[7] The rationale behind "entwinement" is similar to the reasoning in Mr. Justice Brennan's dissented in Moose Lodge in which Mr. Justice Marshal joined: "Liquor licensing laws are only incidentally revenue measures; they are primarily pervasive regulatory schemes under which the State dictates and continually supervises virtually every detail of the operation of the licensee's business. Very few, if any, other licensed business experience such complete state involvement." Moose Lodge No. 107 v. Irvis, 407 U.S. 163, 184-85, 92 S. Ct. 1965, 32 L. Ed. 2d 627 (1972)

discrimination in the admission practices of the defendants[8] who with respect to the State are pervasively "entwine[d] to the point of largely overlapping identity" that implicates state action, Brentwood, 531 U.S. 288, 303.

Ignoring Brentwood and Tancredi, the defense attorneys argue that only activities directly related to the sale of alcohol fall under the State's control. Attorney Grossman claims the disparate treatment in admission based on sex is "entirely outside the ambit of any New York State … regime that regulates the sale or license to sell alcohol," and "to find a connection between admission polices and the sale of alcohol is a stretch of the imagination." (Grossman Supplemental Affirmation ¶¶ 5, 7). The former Moreland Commission on the ABC law, and, presumably, its former First Assistant Counsel Miriam G. Cedarbaum, disagree. The SLA "has the power to alter: (a) the industry's structure …; (b) the industry's behavior, by prescribing and proscribing specific dimensions of business conduct." N.Y. State Moreland Commission on the Alcoholic Beverage Control Law, Study Paper No. 4, October 27, 1963, p. 6.

SLA Rule § 48.3 requires compliance with governmental regulations of which the State's laws against discrimination based on sex are included—N.Y. Civ. Rights §§ 40, 40-c and N.Y. Exec. § 296(2)(a). ABC Law § 2 also requires the SLA to promote the "public convenience and advantage"—"a broad administrative standard that confers considerable latitude on the" SLA, N.Y. State Moreland Commission on the Alcoholic Beverage Control Law, Study Paper No. 4, p. 5. Discrimination against either sex is not a public convenience or advantage and falls within the pervasive power of the SLA. Seidenberg v. McSorleys' Old Ale House, Inc., 317 F. Supp. 593, 601. Further, the SDNY has already held that the regime of on-

---

[8] Attorney Grossman misrepresents that the Amended Complaint "deals solely with the alleged 'promotional activities' of the Defendants." (Grossman Supplemental Affirmation ¶ 5). Attorney Grossman uses quotes around "promotional activities" as though quoting the Amended Complaint. That phrase does not appear anywhere in the Amended Complaint.

premise retail licensing results in more than a "scintilla of State action, …. such action which may be considered ubiquitous and pervasive."  Seidenberg v. McSorleys' Old Ale House, Inc., 308 F. Supp. 1253, 1259.

This case is different from those finding no state action because the state had not reserved the power to approve or disapprove the activity complained of, and here it is the State's authority on which the state action issue depends.  *See* Horvath, 362 F.3d at 154.  When the defendants' practices occur in the pervasive control settings of alcohol retailing for on-premise consumption, and the defendants engage in discriminatory practices in order to maximize their State franchise value, the State has a role, and is obligated to prevent discrimination in violation of N.Y. Civ. Rights §§ 40 & 40-c and N.Y. Exec. § 296(2)(a).  The SLA's broad authority to revoke or deny renewal of a franchise license for reasons deemed by it to serve the "public convenience and advantage" includes the prevention of unjustified discrimination in the exercise of the privilege granted the defendants.  The ambit of the regime is complete because the State, if it so chose, could expropriate the liquor industry unto itself.  None of the governmental authority over nursing homes in Blum v. Yaretsky, 457 U.S. 991, 102 S. Ct. 2777, 73 L. Ed. 2d 534 (1982), or over utilities in Jackson v. Metropolitan Edison Co., 419 U.S. 345, 95 S. Ct. 449, 42 L. Ed. 2d 477 (1974), could prevent the discriminatory practices in those cases, but that's not the situation here.  New York State so effectively controls the provision of alcohol for on-premise consumption as to convert the defendants' discrimination into state action.

Under the defense attorneys arbitrary narrowing of the ambit of the State's regime, bizarre results would occur.  For example, the defendants are required to properly supervise their premises—inside and outside.  This extends to noise, fights, disorders and any unlawful

behavior that may affect the health, safety and repose of the area's inhabitants.  SLA Handbook for Retail Licensees, p. 5, May 2006.  Under the defendants' theory, the portion of the noise caused by those who are waiting to enter a nightclub but not to drink alcohol is beyond the power of the SLA to require the licensee to quiet those customers because the noise is "entirely unrelated to the sale of alcohol…."  (Grossman Supplemental Affirmation ¶¶ 5, 7).  That's not how the SLA, nor the State sees it.

Concerning the pervasive extent of State power over the defendants, AER's attorney misrepresents, while Lotus's attorney does so stridently, that the Amended Complaint at ¶ 53 admits the State has no power over the defendants' discriminatory admission practices.  (Elliott Supplemental Affirmation ¶ 9, Donovan Supplemental Memorandum. pp. 4, 8).  The Complaint at ¶ 53 concerns whether the defendant discos decided to charge guys more than females or their agent promoters did.  Attorney Donovan in her initial memorandum of law at p. 5 n. 3 argued that the promoters—not the defendant discos—made the decisions.  The Amended Complaint at ¶ 53 states that as between the two, the defendant discos and not the promoters decided.  It does not, as attorney Elliott and Donovan's Clintonesque reading claims, that the State has no power to put an end to the discriminatory practices.

Constitutional standards are invoked "when it can be said that the State is **responsible** for the specific conduct of which the plaintiff complains," Blum v. Yaretsky, 457 U.S. 991, 1004 (emphasis in original).  In Brentwood the Supreme Court cautioned that the concept of responsibility is not to be read narrowly in the context of the state action inquiry.  Horvath, 362 F.3d 147, 154.

The 21st Amendment gave New York State the "responsibility of handling its liquor problems."  Report of the State Liquor Authority, p. 5.  By not exercising its responsibility and

its comprehensive authority under the law in putting an end to the defendants' discriminatory practices, the SLA is responsible for the continuing rights violations. *See* <u>Seidenberg v. McSorleys' Old Ale House, Inc.</u>, 317 F. Supp. 593, 599 ("the state has continued annually to renew defendant's license over the years despite its open discrimination against women, without making any effort in the exercise of the broad authority granted it, to remedy the discrimination or revoke the license which defendant must have in order to practice it.").  Here as in <u>Burton</u>, the State "by its inaction … has not only made itself a party" to the discrimination, but has "elected to place its power, property and prestige behind the admitted discrimination."  <u>Burton v. Wilmington Parking Authority</u>, 365 U.S. 715, 725, 81 S. Ct. 856, 6 L. Ed.2d 45 (1961).

Instead of the Supreme Court's entwinement and responsibility standards, the defendants advocate a "but for" causal relationship between state activity and the discrimination.  Okay, "but for" the State's failure to require adherence with SLA Rule § 48.3 and ABC Law § 2, the discriminatory practices would not exist.  Or, "but for" the franchise rights granted the defendants, they would not be able to engage in the particular discriminatory conduct alleged.  <u>Seidenberg v. McSorleys' Old Ale House, Inc.</u>, 317 F. Supp. 593, 598.  Further, any revocation or refusal to renew defendants' franchise license for invidious discrimination would not likely be set aside for being arbitrary and capricious.  <u>McSorleys'</u>, 317 F. Supp. 593, 601.

The defense attorneys try to distinguish the <u>McSorleys'</u> decisions by arguing the rulings deal only with state action in the discriminatory denial of alcohol to two females.  <u>First</u>, it's not clear whether the denial was for alcoholic or non-alcoholic drinks, or for food.  The opinions only say the ladies were denied service.  <u>Second</u>, Judge Tenny specifically says, "The question presented, then, is whether by virtue of this pervasive regulatory scheme the licensee may

properly be considered an instrumentality of the State whose acts may, for the purposes of the 14th Amendment, be considered the acts of the State itself." Seidenberg v. McSorleys' Old Ale House, Inc., 308 F. Supp. 1253, 1257. The defendants' disparate treatment of guys and ladies for admission hardly represents an exercise of individual choice in the use of private property, since the defendants are open to the public. *See* Seidenberg v. McSorleys' Old Ale House, Inc., 317 F. Supp. 593, 604. Rather the defendants are acting as the instrumentality of the State, and since the State could not constitutionally discriminate on admission, neither can the defendants.

Since the McSorleys' case, which is legally identical to this action, relies on Burton, 365 U.S. 715, attorney Donovan (Lotus) unilaterally declares Burton as "outdated and does not take into account subsequent Supreme Court rulings." (Donovan Supplemental Memorandum p. 6). Here we go with a Doctor Who view of time again. How could Burton "take into account" rulings that came after it—not possible in a Newtonian Universe. The question is whether subsequent Supreme Court decisions overruled Burton or parts of it —they have not, and attorney Donovan has provided no authority that they have. In fact the Supreme Court in Rendell-Baker v. Kohn, 457 U.S. 830, 843, 102 S. Ct. 2764, 73 L. Ed. 2d 418 (1982), relied on Burton. More about Rendell-Baker later.

When not dismissing Burton outright, attorney Donovan wrongly claims it has nothing to do with this action. (Donovan Supplemental Memorandum pp. 5 – 6). She falsely asserts that Burton "turned on the existence of an appearance of government approval." The decision actually turned on the symbiotic relationship between the state and the restaurant, which is part of the entwinement analysis. Burton, 365 U.S. at 724-25 ("[t]he State has so far insinuated itself into a position of interdependence with Eagle that it must be recognized as a joint

16

participant in the challenged activity, which, on that account, cannot be considered to have been so 'purely private' as to fall without the scope of the 14th Amendment.").

The factual connections that amount to a symbiotic relationship will naturally differ from case to case. Since the state action determination turns on the specific fact situation, Burton, 365 U.S. at 722, arguing that there's no symbiotic relationship because the specific facts in Burton aren't identical to the specific facts here is ludacris. But that's what attorney Donovan does in her Supplemental Memorandum at pp. 5 – 6. Here the facts aren't identical to Burton, but the result of state action is the same. The defendant retailers of alcohol operate as willful participants in joint activity with the SLA in controlling the sale of alcoholic beverages for the purpose of fostering and promoting temperance in consumption and respect for and obedience to law. *See* ABC Law § 2. The defendants are doing the State's work under the State's close supervision.

Lotus' attorney Donovan also pulls out of the hat a state action requirement that governmental involvement must be evident to the "average person." (Donovan Supplemental Memorandum p. 6). There's no such legal standard in America—the closest is the reasonable person with knowledge of the facts. The U.S. Supreme Court in Brentwood talked about the "range of [factual] circumstances that could point toward the State behind an individual face, …." Brentwood, 531 U.S. at 295. It didn't advocate as a test pulling some guy off the street for his opinion. That's for the news media not the law. The legal test is not the perception of the average man in the street.

Among many of the facts cited in the McSorleys' decisions for finding a close nexus between the State and the tavern, most of which also apply to this action, was the requirement

that the alcohol license be displayed were customers may see it.[9] <u>McSorleys'</u> 317 F. Supp. at

603. Attorney Donovan argues that alone is insufficient for finding entwinement, but that alone

is not what the Amended Complaint alleges. (Donovan Supplemental Memorandum pp. 6 – 7).

   Subsidies provided by the State are another factor used for determining entwinement.

The plaintiff class's Opposition Memorandum argues this point at pp. 17 – 19. Defendant Sol

falsely states the plaintiff class provides no "basis in fact or law" for such. (Grossman Reply p.

9). The plaintiff class cited to <u>Seidenberg v. McSorleys' Old Ale House, Inc.</u>, 317 F. Supp. 593,

602; and <u>William H. Van Vleck, Inc. v. Klein</u>, 50 Misc. 2d 622, 271 N.Y.S.2d 64 (Sup. Ct.

1966) and now cites to the Amended Complaint ¶¶ 15 – 17, 43 – 46, which attorney Grossman

ignored in his original reply.

   Pervasive entwinement results when the State provides valuable franchise rights, a form

of subsidy, to a private actor. *Cf.* <u>Horvath v. Westport Library Ass'n</u>, 362 F.3d 147, 154. The

defendants argue they receive no "[s]tate assistance and no more benefits than [any] other

business or profession that is licensed." (Grossman Reply p. 8). The defense attorneys fail to

make the distinction between restrictive and nonrestrictive licensing. Restrictive regulation

places quantitative limits on the number of businesses in an industry, such as on-premise

retailers of alcohol. The SLA has the discretion to limit the number of licenses, ABC Law §§ 2,

17(2), and their locations, ABC Law § 2. On the other hand, nonrestrictive regulation allows all

who meet the prescribed standards, regardless of number, to conduct their business, such as

lawyers, doctors, accountants, and bicycle shop owners among others.

   "Where all qualified candidates can get a license for the asking, franchise value is

negligible." <u>N.Y. State Moreland Commission on the Alcoholic Beverage Control Law</u>, Study

---

[9] Attorney Donovan asserts such a license display is useless because of dim lighting, which betrays her lack of knowledge concerning the pervasive regulations her client conforms to. Lotus' lighting is sufficient for reading 9-point print.

Paper No. 4, October 27, 1963, p. 39 (the study focused on off-premise licensees, but the economic considerations equally apply to on-premise licensees).  By limiting entry into the alcohol industry, the State provides the defendants an extremely valuable franchise.  The alcohol industry in New York has the highest degree of economic protection, which provides its participants with substantial windfalls on their "franchise values".  N.Y. State Moreland Commission on the Alcoholic Beverage Control Law, Report and Recommendations, January 3, 1964, p. 27.  The SLA authority controls entry into the alcohol industry not only for economic reasons but also for alcohol consumption control.  N.Y. State Moreland Commission on the Alcoholic Beverage Control Law, Study Paper No. 4, October 27, 1963, p. 5.  The stringent government supervision and protection of New York's alcohol industry arbitrarily creates and maintains high franchise values.  Id. at p. 14.

"Franchise value equals the present discounted value of future income expected to be earned by licensees and which is attributable to possession of a license."  Id. at p. 16.  The fewer number of licensees in the market, the greater will be the expected earnings.  Id.  In unregulated industries with low entry barriers, the increase in income, population, or demand will cause new firms to enter, but not so with the alcohol industry, Id. at p. 21, because State power protects the franchise value of licensees, such as the defendants.

Benefits flowing from the private actor's discrimination to the government also indicate entwinement.  Where the private party's profits would suffer without discrimination and so too would a state's financial position, it supports the conclusion that a state should be charge with the discriminatory actions.  Rendell-Baker v. Kohn, 457 U.S. 830, 843.  The defendants conduct Ladies Nights because it makes them money that would not otherwise be made, and some of those profits end up in the State's coffers.

Surely, it cannot be that government, state or federal, is able to evade the most solemn obligations imposed in the Constitution by simply delegating some of its authority to private corporations.  On that thesis, <u>Plessy v. Ferguson</u>, 163 U.S. 537, 41 L. Ed. 256, 16 S. Ct. 1138 (1896), can be resurrected by the simple device of having the State operate segregated trains through selected private applicants for railroad licenses.  The defense attorneys support that thesis when it comes to on-premise retailers of alcohol discriminating against men.  Under the law, however, there is no constitutional way in which a State can license and supervise a business serving the public and endow that business with the authority to manage its operations on the basis of sex discrimination of males.  Such is foreign to our Constitution.

<u>(2)  The defendant retailers of alcohol for on-premise consumption exercise a public function.</u>

State action may be found in situations where an activity that traditionally has been the exclusive, or near exclusive, function of the State has been contracted out to a private entity. <u>Horvath v. Westport Library Ass'n</u>, 362 F.3d 147, 151 (2d Cir. 2004).

Lotus's attorney Donovan falsely claims there are no allegations in the Amended Complaint that support the provision of alcohol as an exclusive or near exclusive, traditional public function in New York.  (Donovan Supplemental Memorandum. p. 3).  She apparently skipped paragraphs 12 to 14 and 46.  But even without these allegations, whether the defendant on-premise retailers of alcohol carry out an exclusive or near exclusive public function is a legal argument dependent on history for which the Court can take judicial notice.

Attorney Donovan also objects that the history alleged in the Amended Complaint at ¶ 7 isn't sufficiently complete because it "omits … when the State oversaw admission practices" for on-premise retailers.  (Donovan Supplemental Memorandum. p. 3).  What about prohibition when no one was admitted?  What about now when minors under 18 are not permitted unless

accompanied by an adult?  What about SLA Rule § 48.3 that gives the State the power to require the defendants to abide by state regulations, such as N.Y. Civ. Rights Law § 40-c(2): "No person shall, because of … sex … be subject to any discrimination …," which applies to admission practices?  What about ABC Law § 2 that permits the SLA to determine, among other matters, the requirements for admission that provide for the "public convenience and advantage"?  Since different treatment amounts to discrimination, Reed v. Reed, 404 U.S. 71, 75-77, 92 S. Ct. 251, 30 L. Ed. 2d 225 (1971), admission practices treating guys and females differently are discriminatory, and all such practices by the defendants are within the SLA's power to stop.

Clearly, the defendants are not merely private actors whose internal management decisions are beyond state regulation.  See Horvath, 362 F.3d at 152.  The defense attorneys ignore that this case is about discrimination under a regime that two Judges of the SDNY have found to amount to state action.  Attorney Donovan also ignores inconvenient allegations in the Amended Complaint by asserting they don't exist, such as  ¶¶ 8 and 41(j) that cite to N.Y. Civ. Rights Law § 40-c, which impacts admission policies, just as she ignores human rights by claiming the defendants can charge what they want for admission.  (Donovan Supplemental Memorandum p. 4).  Not if those charges treat similarly situated persons differently.

The sophistry of attorney Donovan's argument becomes apparent if the Court were to consider what would constitute state action had the State decided after prohibition to set up and operate on-premise retailers itself.  In that situation, the different treatment of customers for admission would clearly constitute state action.  There's no logical reason that because the State chose to delegate its public function to corporations operating under the State's comprehensive control that state action somehow disappears unless the barmaid refuses to hand someone an

21

alcoholic drink.  *See* <u>Horvath</u>, 362 F.3d at 151.  What if the ladies in <u>McSorleys'</u> had been charged $20 for admission and guys got in free?  It's unlikely the <u>McSorleys'</u> judges would have ruled differently.

Defendant Sol (attorney Grossman) misrepresents the plaintiff class's argument concerning public function by asserting the class "claims supplying utility services is less of a public function than that of "on-premise retailers of alcohol."  (Grossman Reply p. 10).  The plaintiff class's Opposition Memorandum doesn't argue that, it states the U.S. Supreme Court found the supplying of utility services was <u>not</u> a traditional public function at all.  <u>Jackson v. Metropolitan Edison Co.</u>, 419 U.S. 345.  "[I]f we were dealing with the exercise by Metropolitan of some power delegated to it by the State which is traditionally associated with sovereignty . . . our case would be quite a different one."  <u>Jackson</u>, 419 U.S. at 352-53.  In this action, the State has delegated power traditionally associated with its sovereignty; therefore, <u>Jackson</u> is inapplicable because here a public function exits—in <u>Jackson</u> it didn't.

In trying to distinguish <u>Evans v. Newton</u>, 382 U.S. 296, 86 S. Ct. 486, 15 L. Ed. 2d 373 (1966), attorney Grossman prevaricates in asserting that it dealt only with a city operating a park.  (Grossman Reply p. 10).  He failed to state the crucial fact of the case was that the city transferred the park's operations to private persons—the city delegated its public function.  That's exactly what New York State has been doing since the end of prohibition:  transferring some of its sovereignty over alcohol to private persons.  Unlike in <u>Evans</u>, New York hasn't delegated all its public function because it still maintains comprehensive control over the recipients and can at any time take back its granted privileges and set up a state run monopoly.  <u>Seidenberg v. McSorleys' Old Ale House, Inc.</u>, 317 F. Supp. 593, 599-600; *see*  <u>N.Y. State</u>

<u>Moreland Commission on the Alcoholic Beverage Control Law</u>, Study Paper No. 4, October 27, 1963, pp. 33, 39.   So here, government involvement is even greater than in <u>Evans</u>.

Also trying to distinguish <u>Evans</u>, attorney Donovan asserts "the operation of a city park" cannot be analogized with "determining admissions polices at a nightclub."  (Donovan Supplemental Memorandum p. 3).  The discrimination in <u>Evans</u> was actually the park's admission policies under the operation of private individuals.  In <u>Evans</u>, the private operators of the park became city agents, and just as the city could not discriminate in admission polices or in sweeping, manicuring, watering, patrolling, and maintaining the park, neither could the city's agents.  "[W]hen private individuals or groups are endowed by the State with powers or functions governmental in nature, they become agencies or instrumentalities of the State and subject to its constitutional limitations."  <u>Evans</u>, 382 U.S. at 299.  When the SLA endowed the defendants with the governmental sovereignty of providing alcohol for on-premise consumption, they received a public function, and the defendants, just as the State if it provided alcohol for on-premise consumption, cannot discriminate in admission policies or in employee hiring or in supplier contracting or in charging different prices to different customers or in other activities.

In a truly bizarre twist, defense attorney Donovan questioned the plaintiff class's citation to <u>Marsh v. Alabama</u>, 326 U.S. 501, 66 S. Ct. 276, 90 L. Ed. 265 (1946).  (Donovan Supplemental Memorandum p. 4).  <u>Marsh</u> is used for the legal proposition that when a private party carries out the functions of government, it steps into the shoes of the government and becomes a state actor for all discriminatory activities.  *See* <u>Marsh v. Alabama</u>, 326 U.S. at 507-08; (Opposition Memorandum p. 19).  In such situations, "even had there been no express franchise but mere acquiescence by the State in the corporation's use of its property …

including the segment owned by the corporation, [it] would still have been performance of a public function and discrimination would certainly have been illegal." Marsh, 326 U.S. at 507 (citations omitted).

Public function is a theory of state action independent from Burton. Here the public function entails the provision of alcohol for on-premise consumption over which the State has absolute sovereignty. New York State Liquor Authority v. Bellanca, 452 U.S. 714, 715, 101 S. Ct. 2599, 69 L. Ed. 2d 357 (1981); Seidenberg v. McSorleys' Old Ale House, Inc., 317 F. Supp. at 599-600. The retail sale of alcohol is not a private activity, but one reserved to the State. *See* Report of the State Liquor Authority, April 12, 1933 – December 31, 1934, pp. 5 - 11. The State of New York has chosen to delegate part of that function to the defendants who in carrying it out exercise an exclusive, or near exclusive, public function.

### (3)  New York State provides significant encouragement, overt and covert, for the discrimination of men by the defendants in order to give females preferential treatment.

Under Brentwood as read by the Second Circuit, the State need not coerce or even encourage the discriminatory practice if "the relevant facts show pervasive entwinement to the point of largely overlapping identity" between the State and the entity that the plaintiffs contend is a state actor. Horvath, 362 F.3d at 154 (quoting Brentwood, 531 U.S. at 303). As argued above in Section (1) the State is pervasively entwined with the defendants to such an extent that the defendants are surrogates of the State, and in Section (2) the defendants are an extension of the State by performing the public function of on-premise retailing of alcohol. Taking into account the allegations in the Amended Complaint, the statements and documents incorporated into the Amended Complaint by reference, documents relied on by the plaintiff class, and judicial notice, it is clear that the State and the defendants have overlapping identities.

24

As an alternative argument, the existence of a close nexus between the State and an ostensibly private actor can depend on whether the State provides such significant encouragement, either overt or covert, that the choice to discriminate must in law be deemed to be that of the State.[10]  Am. Mfrs. Mut. Ins. Co. v. Sullivan, 526 U.S. 40, 52, 119 S. Ct. 977, 143 L. Ed. 2d 130 (1999)(citations omitted).  The Supreme Court in American ruled that the alleged discriminatory practices, like the ones in Blum, "turn[ed] on . . . judgments made by private parties" without "standards . . . established by the State," Blum, 457 U.S. at 1008, and without state standards, there was no state action.

Here, however, the SLA established a standard that approves of discrimination against men by its affirmative conduct of repeatedly renewing the defendants' licenses while refraining from filing complaints and holding hearings under ABC § 17 for the defendants' violations of SLA Rule § 48.3, which requires compliance with governmental regulations, such as N.Y. Civil Rights Law § 40 & 40-c and N.Y. Exec. Law § 296(2)(a).  In effect, the SLA established a *de facto* standard that for practical purposes obviated New York's laws against sex discrimination by the defendants when such discrimination in admissions violated the civil rights of men.  As a result, the SLA provided not just its stamp of approval for the discrimination, but an impetus for continuation of the practice.

The State, therefore, has provided significant encouragement for the preferential treatment of females at the expense of the rights of guys.  Without such encouragement from the State, the defendant retailers of alcohol wouldn't dare discriminate against males by providing females preferential treatment.

---

[10] "Overt" means "open and observable", "covert" means "concealed and hidden".  American Heritage Dictionary, 2d College Edition.

The State also has a dollar and cents reason for encouraging the defendants' discrimination by refusing to stop it. The defendants discriminate in order to maximize return on their State franchise or subsidy. The SLA knows this, and encourages it because increased revenues for the defendants means more money for the State's treasury. The State, therefore, financially benefits directly from the discrimination of which the current feminist establishment approves. In <u>Burton</u>, the State also benefited financially from the restaurant's discrimination at a time when much of the then conservative establishment approved of such disparate treatment based on color. In <u>Burton</u>, as here, treating similarly situated persons differently mutually benefits both the State and the ostensibly private actor. <u>Burton</u>, 365 U.S. 715, 723-24.

AER and Lotus wrongly claim that the Amended Complaint does not allege covert or overt encouragement of the defendant on-premise retailers treating guys and ladies differently. (Elliott Supplemental Affirmation ¶ 6; *see* Donovan Supp. Memo. p. 4).[11] The Complaint specifically asserts such at:

47. The SLA's broad authority to revoke or refuse a license for reasons deemed by it to serve the "public convenience and advantage," includes the prevention of unjustified discrimination in the exercise of the privilege granted the defendants, such as treating females and males differently for admission.

48. The SLA has continued bi-annually to renew defendants' privilege to retail alcohol for on-premise consumption despite the defendants open discrimination against males by charging them more for admission or making it more timely or economically burdensome for males to enter the discos than for females.

49. The SLA has not made any effort through the exercise of the broad authority granted it by the legislature to remedy the discrimination or to suspend or to revoke the licenses that the defendants must have in order to practice their discrimination.

50. Without the privilege to retail alcohol, the defendants would not be in a position to discriminate against men because without alcohol virtually no one, except members of temperance unions, would frequent defendant discos. The defendants would soon be out of business.

---

[11] Donovan mixes up a complaint's allegations with evidence. Complaints don't provide evidence. *See* <u>NOW, Inc v. Scheidler</u>, 510 U.S. 249, 256, 127 L.Ed.2d 99, 114 S.Ct. 798 (1994).

51. In order to increase revenues, the defendants operate the discriminatory Ladies Nights, which the SLA permits by failing to put an end to the defendants' disparate treatment of guys and females.

52. Part of the increased revenues from Ladies Nights inure to the benefit of New York State's Treasury by supporting the numerous fees charged the defendants by the SLA for various matters.

Attorney Elliott also argues that because the SLA continues to renew the defendants licenses there is no state encouragement. (Elliott Supplemental Affirmation ¶ 8). In McSorleys' the SLA's continued renewal of the bar's license was considered encouragement and significant in finding state involvement. Seidenberg v. McSorleys' Old Ale House, Inc., 317 F. Supp. 593, 599, 603. McSorleys' stated at 596 (citing Burton, 365 U.S. 715, 725): "Where the state has become sufficiently involved, its inaction, acquiescence or continuation of its involvement under circumstances where it could withdraw, may be sufficient."

Lotus's attorney Donovan goes one step further by wrongly asserting that Blum v. Yaretsky, 457 U.S. 991, overruled that quoted statement in the 1970 McSorleys'—and did so without telling anyone except her. (Donovan Supplemental Memorandum p. 5). She mistakenly argues the McSorleys' quoted statement means that the "[m]ere approval of or [mere] acquiescence in the initiatives of a private party" are sufficient to justify holding the State responsible for those initiatives. (Donovan Supplemental Memorandum p. 5). The word "mere" as used in Blum means: done or invoked without assistance, exclusive of or considered apart from anything else. Webster's Third New International Dictionary, 1999. The McSorleys' statement, however, includes the qualification of "**[w]here the state has become sufficiently involved** …." When the state is "**sufficiently involved**," the word mere no longer applies.

27

Attorney Donovan's efforts to unilaterally overrule a case she doesn't agree with have even led her to trash the value of Shepard's—not surprising given her failure to shepardize Conley v. Gibson, 355 U.S. 41, 78 S. Ct. 99, 2 L. Ed. 2d 80 (1957).  Apparently for her, Shepard's is meaningless unless it supports her position.  Back to reality:  had Blum overruled McSorleys' —a case cited with approval on finding state action in the landmark sex discrimination case Craig v. Boren, 429 U.S. 190, 97 S. Ct. 451, 50 L. Ed. 2d 397 (1976), someone, other than attorney Donovan, would have heard about it.

More misrepresentations of the ruling in Blum are used by attorney Donovan in saying the case "precisely" overruled "that encouragement, toleration or acquiescence of a private entity's policy creates state action."  (Donovan Supplemental Memorandum p. 5).  The test that Blum actually used for determining state action is "a State normally can be held responsible for a private decision only when it has exercised coercive power **or** has provided such significant encouragement, either overt or covert, …."  Blum, 457 U.S. at 1004 (emphasis added).  There was no throwing out of encouragement, toleration or acquiescence, only acquiescence without sufficient involvement.  And there was also no requirement that the discriminatory practices had to be "sponsored" by a state as Donovan contends.  (Donovan Supplemental Memorandum p. 6).

The fact situation in Blum is dramatically different than in McSorleys' and this action, which is identical to McSorleys'—except that ladies benefit from the discrimination here.  In Blum the State had no power over whether nursing home patients were transferred to other facilities and "[the] degree of [State] involvement [was] too slim a basis on which to predicate a finding of state action in the [transfer] decision itself."  Blum, 457 U.S. at 1010.  In this action, however, the State is intricately and vastly involved with the defendants and has the power

under SLA Rule § 48.3 and ABC Law § 2 to put a stop to the discrimination, which it has

chosen not to, thereby, encouraging it.

Official encouragement can also result from a practice followed as a matter of course to

an extent that it has the force of law.  For example, the accepted custom of government officials

in the deep south to discriminate against blacks during the 1950s and 60s encouraged similar

activities by private actors.  *Cf.* <u>Lombard v. Louisiana</u>, 373 U.S. 267, 83 S. Ct. 1122, 10 L. Ed.

2d 338 (1963).  Today, after 40 years of lobbying and intimidation, the special interest group

called "Feminism" has succeeded in creating a customary practice in many governmental

institutions at the federal, state and local levels in which the invidious discrimination of men is

the accepted and preferred mode of behavior.  Feminism has become the establishment:  a

unitary belief system accepted by such a large number of government officials and employees

that it dominates over the Constitution when the rights of men are at stake.  The purpose of this

matriarchal establishment is to transit this society into one that provides females with its

benefits but protects them from its burdens while men are stripped of their human rights.

Just look around, the custom of discriminating against men is so widespread as to be

medievally inquisitional in nature.  Up to 70% of divorces are initiated by females, yet they

almost always receive custody of the children along with child support that includes hidden

alimony.  Failure to pay lands the former-husband in debtor's prison, a relic of the middle ages

except primarily for men.  Females can murder newborns, their boyfriends and husbands and

receive minimal to no incarceration based on pseudo psychological pardons.  Ladies regularly

commit perjury in sexual harassment, domestic violence, and rape cases, but are never

prosecuted for their perjury when caught.  In most states of America, a female can lie about a

man being the father of her child, trick him into marriage, and once he discovers the truth and

obtains a divorce, he still has to pay child support, with the hidden alimony, for a child that is inconvertibly not his.

Over 58,000 American men died fighting in Viet Nam but only eight (8) American females[12], and 1.8 million more females voted for Lyndon Johnson than males. Today, guys, not females, must register for the military draft, and if they do not, they face penalties and an inability to work for government: federal, state, and local. The U.S. Department of Justice has an Office on Violence Against Women but no such office for men even though females are as likely as men to engage in domestic violence, and females are three times more likely to use a dangerous weapon. The Federal Government has a Department for feminine health but none for male health even though men die sooner than females. Congress's Violence Against Women Act provides significant funds primarily to feminist organizations. New York State's Board of Regents encourages colleges to offer female studies but not male studies.

Under such governments as these, whether federal, state, or local, the encouragement to discriminate against men has become a persistent and ugly custom. The SLA is part of this customary practice to discriminate against men and that practice is exploited by the defendants. If there is any doubt, try to image the uproar if the SLA permitted the same type of discrimination by the defendants against females.

(4) Defendants' Misconstruing of Cases

_Edmonson v. Leesville Concrete Co., 500 U.S. 614, 111 S. Ct. 2077, 114 L. Ed. 2d 660 (1991)._

Sol's attorney Grossman tries to distinguish Edmonson from this case by torturing the analogy. (Grossman Reply p. 9). He claims the defendants here are like the jury in Edmonson, but the accurate analogy is that the defendant retailers are similar to the Edmonson private

---

[12] 59 civilian American females also died in Viet Nam.

attorney who used the court's preemptory challenge system to discriminate against potential jurors of a certain color.  Here, the on-premise retailers use their licenses to sell alcohol, which attracts customers, and then discriminate against some of those customers based on sex.  So the potential jurors in Edmonson are similar to the customers here.  Although the potential jurors didn't have a choice and customers of on-premise retailers do, it shouldn't make a difference when civil rights are at stake.  Plessy had a choice too:  the "White" car or the "Colored" car.  He chose the "White" and lost because of the self-righteous, hypocritical, bigotry of the establishment of that time—not because of the Constitution.

*Moose Lodge No. 107 v. Irvis, 407 U.S. 163, 92 S. Ct. 1965, 32 L. Ed. 2d 627 (1972).*

Lotus' attorney Donovan repeats her argument that Moose Lodge governs this action even though it is a case dealing with a private club—not one open to the public, and regulated by the Pennsylvania regime concerning alcohol—not New York's.  For the plaintiff class's position, she only refers to the Amended Complaint—not the plaintiff class's Opposition Memorandum.  Since legal arguments are the purview of memoranda and not complaints, and so as not to repeat arguments already made, the plaintiff class does what attorney Donovan should have done and cites to the Opposition Memorandum at pp. 12 –14.  She also failed to state that New York regulates private clubs less stringently than the defendant discos that are open to the public.  Seidenberg v. McSorleys' Old Ale House, Inc., 317 F. Supp. 593, 604.

The distinction between private and public accommodations in Moose Lodge is crucial because of the differing regulatory schemes for private and public providers of alcohol.  The U.S. Supreme Court made the distinction in Moose Lodge by stating that the label "private club" can be and has been used to evade both regulations of state and local liquor authorities, and statutes requiring places of public accommodation to serve all persons without regard to

race, color, religion, or national origin, and, presumably today: sex. Moose Lodge No. 107 v. Irvis, 407 U.S. 163, 177-78, 92 S. Ct. 1965, 32 L. Ed. 2d 627 (1972). Because Moose Lodge was a private club, it could discriminate in its membership and in which guests it chose to serve alcohol. Id. at 171-72. Just as a person can discriminate in his own home.

As a result of Moose Lodge No. 107 coming under the private club regime, the Court did not find a symbiotic relationship as in Burton. Moose Lodge, 407 U.S. at 177. Although under the current expansive state action doctrine of Brentwood, the Court might have found "entwinement". Cf. Tancredi v. Metro. Life Ins. Co., 378 F.3d at 229-30. Without a symbiotic relationship, state action in Moose Lodge depended on whether Pennsylvania's private club regulations "overtly or covertly … encourage discrimination." Moose Lodge, 407 U.S. at 173. Attorney Donovan misrepresents the standard as the State having to "participat[e] in promulgating or implementing the discriminatory practices" or "design" the law "to discriminate" (Donovan Supplemental Memorandum p. 2), which are higher hurdles than the one of encouragement stated by the Court.

Attorney Donovan also misrepresents that Moose Lodge explicitly relied on Pennsylvania law not discriminating with respect to individuals being "served liquor in places of public accommodation." (Donovan Supplemental Memorandum p. 2). She covered her misrepresentation by citing to the wrong page in Moose Lodge. The correct pages are 175-76, which refer to pages 177-79 where the Court states that application of the regulation in question "would be to invoke the sanctions of the State to enforce a concededly discriminatory private rule." Since application of the regulation involved state action, the plaintiff was entitled "to a decree enjoining the enforcement of § 113.09 of the regulations promulgated by the Pennsylvania Liquor Control Board insofar as that regulation requires compliance by Moose

Lodge with provisions of its constitution and bylaws containing racially discriminatory provisions." Moose Lodge, 407 U.S. at 179.

Attorney Donovan also wrongly claims that Moose Lodge requires "state funding" of the premises in question for state action to exist. (Donovan Supplemental Memorandum p. 2). 2). Government subsidies or aid that will give rise to state action do not require a state handing over cold, hard cash. All that is required are specialized benefits that subsidize an ostensibly private entity's activities, see Norwood v. Harrison, 413 U.S. 455, 466, 93 S. Ct. 2804, 37 L. Ed. 2d 723 (1973), which were not present in Moose Lodge because it was a private club and not a public accommodation.

Despite attorney Donovan's misconstruing of the case, Moose Lodge does not hold that state regulations must intend to discriminate, nor that some form of state funding be involved, nor that the state establish admission policies. Moose Lodge holds that while heavy state regulation may give rise to a Burton symbiotic relationship, it is not a *fait accompli.*

Finally on Moose Lodge, the defense attorneys keep harping that McSorleys' is **inapplicable** to this action because in that case the ladies were denied a drink. Yet, they hypocritically claim that Moose Lodge is **applicable** even though the conduct there also involved denying someone a drink, in that case a black man.

*Hadges v. Yonkers Racing Corp., 918 F.2d 1079 (2d Cir. 1990).*

The defense attorneys keep trying to shoehorn a decision against state action for a racetrack into a basis for finding no state action in this civil rights case concerning on-premise retailers of alcohol. In doing so, the defense attorneys ignore the admonition of the case they rely on: Hadges v. Yonkers Racing Corp., 918 F.2d 1079 (2d Cir. 1990). In Hadges, the Second Circuit stated the requirement from Burton, 365 U.S. at 722, that in each case, it is

necessary "to sift through and weigh the facts" for any state action determination because the issue does <u>not</u> "lend itself to formulaic applications." <u>Hadges</u>, 918 F.2d at 1081.

Formulaic application is exactly what the defendants are trying to do by having the facts in <u>Hadges</u> analogized to this case. Their reason is simple. <u>Hadges</u> is a case from the Second Circuit, and they need to counter the precedential value of the <u>McSorleys'</u> decisions. But to do so, they must make the lame argument that <u>McSorleys'</u>, which deals with on-premise retailers of alcohol, is somehow different from this action, also dealing with on-premise retailers of alcohol; whereas, horse racing is somehow identical enough to justify using <u>Hadges</u> to find no state action.[13]

Since the defense attorneys refuse to do the hard work of trying to analogize New York's regime concerning horse racing with its sovereignty over the alcohol industry, perhaps the following case will excuse their lack of earnestness.

The New York Court of Appeals held that a license for horse racing did not implicate a public function, and nor was it a state franchise. <u>Madden v. Queens County Jockey Club, Inc.</u>, 296 N.Y. 249, 254-55, 72 N.E.2d 697 (1947). "Horse racing does not become a function of government merely because, in sanctioning it, the Legislature anticipated a consequent … advantage to the public in 'improving the breed of horses'." <u>Madden v. Queens County Jockey Club, Inc.</u>, 296 N.Y. at 254. Compare "improving the breed of horses" to the purposes for the ABC Law and the SLA of "fostering and promoting temperance … and respect for and obedience to law." ABC Law § 2. The Court of Appeals also ruled that a license to conduct horse racing was not a franchise. <u>Id.</u> at 255. Compare that to statements by the Moreland Commission about permission to participate in the alcohol industry as being a valuable

---

[13] Attorney Grossman cites to himself for the argument that horse racing is similarly regulate as alcohol, as if he is sufficient authority upon which this Court may rely, which he is not. (Grossman Reply p. 10).

franchise right.   <u>N.Y. State Moreland Commission on the Alcoholic Beverage Control Law</u>, Report and Recommendations, January 3, 1964, p. 27.  Clearly, horse racing and alcohol retailing are vastly different regimes in New York.

In New York, a horse racing license is no more than permission to exercise a pre-existing right or privilege which has been subjected to regulation in the interest of the public welfare.  <u>Madden</u>, 296 N.Y. at 255, 72 N.E.2d at 699.   Under the common law, horse racing existed, but the State subsequently decided to regulate it.  <u>Madden</u>, 296 N.Y. at 256, 72 N.E.2d at 699-700.

In New York, a franchise is a special privilege, conferred by the State on an individual, which does not belong to the individual as a matter of common right.  <u>Id.</u> 296 N.Y. at 255, 72 N.E.2d at 699.  A franchise creates a privilege where none existed before primarily to promote the public welfare.  <u>Id.</u>  The alcohol industry in New York has been controlled by government since Colonial times, <u>Seagram & Sons, Inc. v. Hostetter</u>, 16 N.Y.2d 47, 56, 262 N.Y.S.2d. 75, 79, 201 N.E.2d 701, 704 (1965), and there was no inherent right in New York State under the common law to engage in the sale of intoxicating beverages, <u>Seidenberg v. McSorleys' Old Ale House, Inc.</u>, 317 F. Supp. 593, 599.

The defendant discos, therefore, possess a state franchise; whereas, the racetrack in <u>Hadges</u> had a mere license.

**Discrimination**

The discrimination issue in <u>McSorleys'</u> was denying service to two ladies, in this case it's charging guys more for admission than females or making admission for guys more burdensome through arbitrarily imposed time restraints.  Attorney Grossman contends that invidious discrimination can only exist when a person is denied service of alcohol—not when

they are treated differently (Grossman Reply pp. 7, 8; Grossman Supplemental Affirmation ¶¶ 9, 10), and the disparate treatments in admission are "ancillary issues." (Grossman Reply p. 8).

Not according to the Supreme Court: "If there is any one purpose of the 14th Amendment that is wholly outside the realm of doubt, it is that the Amendment was designed to bar States from denying to some groups, on account of their race or color [or sex], any rights, privileges, and opportunities accorded to other groups." Oyama v. California, 332 U.S. 633, 649, 68 S. Ct. 269, 92 L. Ed. 249 (1948)(Mr. Justice Black, with whom Mr. Justice Douglas agreed, concurring). The Equal Protection Clause denies States the power to treat differently females and males whom the courts believe are similarly situated. Reed v. Reed, 404 U.S. 71, 75-77, 92 S. Ct. 251, 30 L. Ed. 2d 225 (1971). "[A]ll persons similarly circumstanced shall be treated alike." Royster Guano Co. v. Virginia, 253 U.S. 412, 415, 40 S. Ct. 560, 64 L. Ed. 989 (1920). It is the difference in treatment of ladies and guys on Ladies Nights that accounts for the invidious discrimination in this action.

If the ladies in the McSorleys' decisions weren't refused service but were charged double for whatever they ordered or the bouncer refused to let them through the front door or charged them more than guys to get inside, even attorney Grossman would call that discrimination.

"To summarize the [Supreme] Court's current directions for cases of official classification based on gender: Focusing on the differential **treatment** or denial of opportunity for which relief is sought, the reviewing court must determine whether the proffered justification is exceedingly persuasive." United States v. Va., 518 U.S. 515, 532-33, 116 S. Ct. 2264, 135 L. Ed. 2d 735 (1996)(emphasis added).

Lotus justifies the discrimination by claiming "[n]ightclubs can charge what they choose for admission…." (Donovan Memorandum p. 4) while AER asserts that the difference in admission price is not so burdensome as to deny men admission (Elliott Supplemental Affirmation ¶ 14). Obviously, neither meets the "exceedingly pervasive" justification. And as for attorney Elliott's "not so burdensome" justification, how does she know? She's a female— she gets into these discos for free or at a reduced price or a guy pays her way. What does she know of the financial burdens on men—nothing.

For arguments sake, however, let's assume she's right—it's not so burdensome. In that case, the plaintiff class is willing to make a deal. If AER reverses the price for guys and ladies—charges ladies what it does guys and guys what it charges ladies—the plaintiff class will settle. Sounds fair, after all, if the price now charged men is not so burdensome, then by charging it to females instead, it shouldn't be burdensome either.

Lotus's attorney Donovan warns of the alleged harmful impact that a decision in favor of the plaintiff class would have. She analogizes the discrimination in this case with restaurants that offer specials for children and senior citizens, and argues that if discrimination is found here, it will reverberate across the land taking the food out of the mouths of children and the elderly. (Donovan Supplemental Memorandum p. 7). Had she taken the time to research the issue, attorney Donovan would have discovered that in such cases where state action is found, there is no invidious discrimination. Why? Because invidious discrimination requires treating similarly situated people differently. Kids aren't similarly situated with adults because they can't go out and earn a living. Seniors are not similarly situated with working people because most are on fixed income. So giving them a break does not amount to invidious discrimination.

The ladies who party at the defendants, however, are a different story.  They belong to a group that controls over 50% of the nation's wealth and makes 80% of the purchases.  While females only make $.77 for every dollar that guys make, this Department of Labor statistic leaves out a crucial factor:  risk.  Guys are 20 times more likely to be killed or injured on the job; guys suffer 95% of the job related deaths.  In the 25 most dangerous occupations in America, men make up 90% of the workers—the Tombstone Basement.  Low risk and, therefore, lower paying jobs are 95% occupied by females.

When the alleged "wage-gap" is examined from a risk-reward perspective, which is what any astute businessman would do, the wage-gap will probably reverse.  Risky investments, or business activities, require a high enough expected return to compensate for the risk while low risk investments promise a lower expected return because of less risk.  Since there's no more important an investment than a person's occupation, the reward/risk ratio applies to salaries.  Because guys are at greater risk than females:  dying early, more injuries, hidden alimony, and paying more to enter a nightclub; they should receive a higher expected return from their occupations in order to make the investment of life worthwhile.  But when looking at the return per unit of risk, the gap most likely reverses with females making more per unit of risk than guys.  In that situation, the disco ladies should subsidize the guys rather than vice versa.

**Frivolity**

The only matter unworthy of serious attention in this lawsuit is the defense attorneys advocating that guys should financially subsidize females to party.  When a guy pays more to attend one of the defendant retailers of alcohol, that means a lady pays less.  While the individual amount may seem small, add up all those amounts, over all the discos, over all the

years, and then calculate the present value at the Treasury Bill rate. The result is a nice amount of money transferred from the wallets of guys to the pocketbooks of females.

The defense attorneys call this action "frivolous," and attorney Grossman requests that the plaintiff class pay his client's costs, expenses and attorney's fees because the lawsuit was "baseless." He doesn't cite any cases, so here's one: In Tancredi v. Metro. Life Ins. Co., 378 F.3d 220, 229 (2d Cir. 2004), the Second Circuit failed to find state action, but because the plaintiff had based its allegation of state action on a similar case, the allegation of state action was not frivolous or groundless or baseless. The state action issue in this case is identical to two SDNY decisions that found state action: Seidenberg v. McSorleys' Old Ale House, Inc., 317 F. Supp. 593 (1970); Seidenberg v. McSorleys' Old Ale House, Inc., 308 F. Supp. 1253 (1969), not to mention the U.S. Supreme Court's citation with approval on the issue of state action to the 1970 McSorleys' ruling. Craig v. Boren, 429 U.S. 190, 208, 97 S. Ct. 451, 50 L. Ed. 2d 397 (1976).

## CONCLUSION

"A long history of regulation, control, price fixing, place of time and sale setting, and outright extinction lies behind the liquor business in this country since Colonial times, and the rights of those who choose to engage in it are not on a constitutional or legal parity with the rights of people who trade in bicycles, or cosmetics, or furniture." Seagram & Sons, Inc. v. Hostetter, 16 N.Y.2d 47, 56, 262 N.Y.S.2d. 75, 79, 201 N.E.2d 701, 704 (emphasis added). New York State runs the show from top to bottom in the alcohol industry, and if it so chose, the State could abolish the industry or take it over. It's hand is felt in every aspect of the operations of the defendant retailers of alcohol for on-premise consumption.

The problem in this case has no relation to opening or closing the door of one's home, which is the essence of privacy, since the home is in no way dedicated to public use, and in no way extends an invitation to the public.  The facts in this case have little resemblance to any institution of property which is customarily associated with privacy.

The people who own the defendants do not charge men more for admission or make it more burdensome because they do not like men.  The sole reason is that they think such discrimination will make them more money.  They exploit for purely financial gain a relic of Amazonian myth advocated by the feminist special interest group that has cast a forsaken shadow across this land, turning men into second-class citizens.

For a short time in the late 1950s and through the 1960s, the 14th Amendment did away with a second or third or fourth class of citizenship.  Clearly that is no longer true today, since men can be denied the right of being treated as America's first class citizens—females, in not only places of public accommodation but in the courts that are suppose to assure there is only one class of citizenship.

The question here is basic to the way of life in this country and fundamental to its constitutional scheme—is this a country ruled by law or by the ideology of a powerful special interest group.

Dated: New York, NY                                         /S/
       December 28, 2007                        _____
                                                Roy Den Hollander (RDH 1957)
                                                545 East 14 Street, 10D
                                                New York, NY 10009
                                                (917) 687 0652